UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


WILLIAM DUNN                              )
                                         )
v.                                       )          No.  2:13-00107
                                         )          JUDGE CAMPBELL
UNITED STATES OF AMERICA                 )


MEMORANDUM

I.  Introduction

Pending before the Court are the Petitioner's Motion To Set Aside, Correct, Or Vacate

Sentence Pursuant To 28 U.S.C. § 2255 (Docket No. 1); and the Government's Motion To

Dismiss Petitioner's Motion To Vacate, Set Aside, Or Correct Sentence By A Person In Federal

Custody (Docket No. 38).

For the reasons set forth herein, the Government's Motion To Dismiss (Docket No. 38) is

DENIED; and the Petitioner's Motion To Set Aside (Docket No. 1) is GRANTED in part, and

DENIED in part. The Petitioner's conviction on Count 13 should be vacated, and his sentence

should be reduced by 10 years to a total sentence of 315 years of imprisonment. (Judgment, at p.

2 (Docket No. 338 in Case No. 2:06-00019)). All other claims made by the Petitioner are denied.

Also pending before the Court are:

Petitioner's Renewed Motion For Discovery And Issuance Of Subpoenas Reconsideration

(Docket No. 131), and the Government's Response (Docket No. 136) in opposition.  The

Renewed Motion (Docket No. 131) is DENIED, for the reasons set forth in the Court's prior

orders (Docket Nos. 68, 110, 114).

Petitioner's Notice Of Contempt Of Court (Docket No. 133), which requests that the

Court hold attorney Hershell Koger in contempt for failure to produce records in response to Petitioner's subpoena, and the Government's Response (Docket No. 135), attaching Mr. Koger's records (Docket Nos. 135-1, 135-2). Petitioner's request to hold Mr. Koger in contempt is DENIED, as moot.

Petitioner's Amended Motion To Order The Government To Produce Undercover Audio Recordings (Docket No. 144), and the Government's Response (Docket Nos 149, 150), in which the Government produces the audio recordings identified therein. Petitioner's Motion (Docket No. 144) is DENIED, as moot, in light of the Government's filings.

## II. Procedural and Factual Background

The Petitioner and Misty Langford were initially charged with murder for hire, drug distribution and other offenses in an Indictment issued in the underlying criminal case. (Docket No. 22 in Case No. 2:06-00019). Additional charges were added in subsequent superseding indictments. (Docket Nos. 80, 125, 135, 158, 166 in Case No. 2:06-00019). Prior to trial, Co-Defendant Langford pled guilty, pursuant to a Plea Agreement, to conspiracy to commit solicitation of murder for hire, and murder for hire. (Docket Nos. 76-78 in Case No. 2:06-00019).

Following a two-week jury trial, the Petitioner was convicted of all 21 charges contained in the Fifth Superseding Indictment: conspiracy to commit solicitation of murder for hire; conspiracy to commit murder for hire; two counts of murder for hire; two counts of solicitation to commit murder for hire; conspiracy to distribute marijuana, codeine, cocaine, dihydrocodeine, alprazolam, and diazepam; distribution of marijuana; three counts of distribution of cocaine; two counts of possession with intent to distribute various controlled substances; possession and distribution of pseudoephedrine; possession of a machine gun; possession of an unregistered

firearm; possession of a machine gun in furtherance of a drug trafficking crime; possession of a

firearm in furtherance of a drug trafficking crime; solicitation to murder a federal employee; and

two counts of obstruction of justice. (Docket Nos. 166, 252, 338 in Case No. 2:06-00019).

The Court subsequently sentenced the Petitioner to a total term of 325 years of

imprisonment. (Docket Nos. 338, 339 in Case No. 2:06-00019).  The Petitioner appealed, and the

Sixth Circuit affirmed. (Docket No. 374 in Case No. 2:06-00019); United States v. Dunn,

09-5837, 2011 WL 11533293 (6th Cir. Dec. 15, 2011). The Petitioner then filed a petition for writ

of certiorari with the Supreme Court, which was subsequently denied. (Docket Nos. 376, 377 in

Case No. 2:06-00019).

The Presentence Investigation Report describes the evidence adduced at trial as follows:

24. In October 2005, William Dunn and Misty Langford participated in several sales
of controlled substances to a law enforcement agent, including a Putnam County
Sheriff's Office (PCSO) deputy who operated in an undercover capacity.
Specifically, on October 6, 2005, one PCSO deputy and a confidential informant
(CI-1) arranged a meeting to purchase marijuana from Langford and Dunn.
Thereafter, in the parking lot of the Beehive Restaurant in Baxter, Tennessee, the
PCSO deputy, acting in an undercover capacity (PCSO UC), and CI-1 paid
Langford and Dunn $180 in exchange for 25.9 grams of marijuana, which was
confirmed by the Tennessee Bureau of Investigation (TBI) lab.

25. On October 10, 2005, the PCSO UC purchased 102.5 grams of marijuana from
Langford and Dunn at the aforementioned Beehive Restaurant. Ms. Langford
placed the substance in four clear Ziplock bags and weighed it in exchange for
$575. The weight of the substance was confirmed by the TBI lab.

26. On October 14, 2005, PCSO deputies and CI-1 arranged a meeting to purchase
cocaine from Langford and Dunn. The PCSO UC and CI-1 met at Dunn's
residence (next to the Beehive); however, Langford and Dunn were not present.
The PCSO UC called Dunn and was told that he and Langford would arrive
shortly. When Langford and Dunn arrived at the residence, the PCSO UC and CI-1
were told to come inside. The PCSP UC and CI-1 followed Dunn, Langford, and a
child into the residence. Dunn and Langford agreed to the price of $500 for a half
ounce of cocaine. The PCSO UC and CI-1 went to a bedroom with Langford
where she exchanged 13.2 grams of cocaine and a separately wrapped bag of .6

3

grams of cocaine for $500. The substance and weight was confirmed by the TBI.

27. On October 26, 2005, officers arranged a meeting with the defendant to purchase cocaine. The PCSO UC and CI-1 proceeded to Dunn's residence (next to the Beehive). In a bedroom, the defendant measured 14 grams of cocaine in exchange for $500. The parties discussed future transactions, and the defendant advised he would provide a better price if the PCSO UC ordered larger quantities. The TBI confirmed the substance was 13.9 grams of cocaine.

28. On October 28, 2005, a cocaine exchange was arranged with Mr. Dunn. The PCSO UC and CI-1 met the defendant at his residence and proceeded to a bedroom. Mr. Dunn indicated that he did not have enough to make the PCSO UC 'happy.' The defendant weighed out 3.1 grams of cocaine. The PCSO UC indicated the substance was not enough. Mr. Dunn promised more later that evening and told the PCSO UC to call him, handing him a business card. The PCSO UC did not purchase any cocaine at the meeting. Later that evening, another meeting was arranged at the defendant's residence. When the PCSO UC and CI-1 arrived, Mr. Dunn's home reeked of marijuana and approximately four unidentified white males were gathered in the living room.

29. During the meeting, Ms. Langford was in the bedroom speaking to two other males. The defendant and PCSO UC went next door to the Beehive Restaurant and exchanged 13.5 grams of cocaine in exchange for $500. The substance and weight was confirmed by the TBI.

30. On April 10, 2006, a Putnam County grand jury returned a three-count indictment against Dunn for the sale of cocaine and marijuana. On April 24, 2006, PCSO deputies served a Tennessee State arrest warrant for Dunn at his residence. Officers retrieved a bag of marijuana and pills from Dunn's person. The defendant was interviewed and admitted that he went to Mexico a couple times a year and bought the drug tablets found in his home in large quantities.

31. Later that day, officers approached Ms. Langford at her mother's residence. After being Mirandized and signing a waiver and admonition, Ms. Langford advised that the defendant used firearms in drug transactions; that Mr. Dunn had a .25 caliber revolver in his bedroom; that the defendant kept a firearm in his pocket to avoid bad drug deals; that Mr. Dunn had traded cocaine for a 9mm and a .38 firearm, which Dunn knew were stolen; that the defendant had a .25 that 'was put together' from a bunch of different firearms in order to escape identification; that he had a 'big type' machine gun that her father traded Dunn for drugs and to repay a debt; and that Dunn had a storage building in the area.

32. Also on April 24, 2006, officers returned to interview the defendant after their interview of Ms. Langford. After signing a waiver, he admitted he had a .25 caliber

firearm under a mattress at his home which he purchased in Michigan, he received all of his other firearms from his grandfather, and he smoked marijuana on the weekends. The defendant agreed to a search of his residence, on Boat Dock Road, which he shared with his grandmother. He insisted on being present during the search.

33.     A search of the residence revealed the following TBI confirmed quantities: 125 grams of marijuana, 3.3 grams of cocaine, 493 tablets of codeine, 2,369 tablets of dihydrocodeine, and 320 tablets of alprazolam (Xanax). Found in the defendant's bedroom was 17 .25 caliber rounds, 30 .38 caliber rounds, and Norinco 7.62 caliber ammunition.

34.     A search of Dunn's storage unit revealed a 20-gauge shotgun, a .22 caliber rifle, a 12-gauge shotgun, a 7.62 caliber machine gun, a .38 caliber revolver, a .22 caliber revolver, a 9mm semiautomatic pistol, a .32 caliber revolver, and a .25 caliber revolver. It is noted that the machine gun falls within the definition in 26 U.S.C. § 5845(b). In addition, the firing mechanism had been altered with a combination of parts designed and intended to be used as a machine gun.

35.     On April 25, 2006, a subsequent search was conducted at Dunn's residence. Consent was obtained from the defendant and Mr. Dunn's grandmother. A loaded .25 caliber semiautomatic firearm and drug paraphernalia (syringes and spoons with white reside) were found.

36.     Subsequent to the defendant's arrest, the identity of both the PCSO UC and CI-1 were revealed in police reports. The defendant made several copies of the reports and passed them out to fellow drug dealers in Cookeville advising them to spread the word that CI-1 was an informant and that the PCSO UC was a police officer. Both Brian Matheny and Michelle Polites, Matheny's ex-girlfriend, confirmed that Dunn gave Matheny a copy of his discovery materials in order to put Matheny on notice that CI-1 was a confidential informant and possibly providing information to authorities involving Matheny as well as Matheny's drug dealing colleagues.

37.     On June 8, 2006, CI-1 was found dead from what was reported as a drug overdose. According to Ms. Langford, Mr. Dunn received a call on the day of CI-1's death, and in passing, Dunn said to her, 'what a little cyanide can do.' According to Ms. Langford, she and Dunn were at Cedar Rapids Amusement Park when CI-1 overdosed.

38.     On or about October 26, 2006, while Dunn was on bond for the Putnam County charges, Dunn and Langford engaged in a plan to have the PCSO UC killed. The defendants contacted a second confidential informant (CI-2) and asked for his assistance in securing a hit man to murder the PCSO UC. CI-2 later contacted a PCSO employee to advise that Langford and Dunn asked him to kill the PCSO UC

or to help them find someone who would. According to the Government, CI-2 later advised a PCSO deputy that Langford stated that Dunn had already killed CI-1, and if they had the PCSO UC murdered, there would be no one to testify against them in state court. Subsequently, the Putnam County Sheriff's Office and the Bureau of Alcohol, Tobacco and Firearms (ATF) became involved in the investigation.

39.    An ATF Special Agent, working in an undercover capacity (ATF UC), posed as a hit man and was introduced to Dunn and Langford. The ATF UC and CI-2 had telephone conversations and meetings with Langford and/or Dunn to discuss the details of the PCSO UC murder. These meetings and phone calls were recorded.

40.    Specifically, on October 26, 2006, under the supervision of law enforcement authorities, CI-2 was outfitted with a recording device and met with Langford at her residence located at 389 North First Avenue in Baxter, Tennessee. Langford told CI-2 that she and Dunn wanted the PCSO UC killed. CI-2 asked Langford if she meant the PCSO UC, calling him by name. Langford affirmed. Langford also stated that she and Dunn would pay one kilogram of cocaine to CI-2 and whoever helped him kill the PCSO UC. Langford stated that they (meaning her and Dunn) 'want it done' and that they 'don't want to be mentioned at all.' Additionally, Langford indicated that she knew where the PCSO UC's children went to school. CI-2 also told Langford, 'Don't tell anyone else! This is my life!'

41.    On October 27, 2006, CI-2 was fitted with a recording device and again met Langford at her residence. CI-2 asked Langford about the target of the murder for hire. Langford confirmed correctly that the target was the PCSO UC. CI-2 stated that he had a new person to help with the murder for hire and asked Langford if she and Dunn still 'wanted it done.' Langford affirmed. CI-2 asked Langford how they wanted the murder done, and she indicated they did not want it done in front of the kids. CI-2 then asked Langford if she knew where the PCSO UC lived, and she replied, 'no.' When CI-2 requested a down payment, Langford indicated that CI-2 would have to speak with Dunn. Langford also stated that it was her fault that Dunn was indicted. Langford provided a description of the PCSO UC, stating that he drove a dark green Jeep 4 x 4 and described the PCSO UC as tall, with brown hair and a goatee. Langford further said that someone she knew saw the PCSO UC with two kids, approximately ages 5 and 6.

42.    On October 28, 2006, the ATF UC, posing as a hit man, met with Langford. In a recorded conversation, Langford told the ATF UC and CI-2 that she and Dunn definitely wanted the PCSO UC killed. Furthermore, Langford indicated she thought Dunn had something to do with the death of CI-1. When the ATF UC asked Langford who the PCSO UC was working for, Langford responded, 'The law, he set us up.' Langford stated that Dunn 'was the main one wanting this thing done' and explained that she had not been indicted. Langford expressed that they

did not care how the ATF UC killed the PCSO UC; however, they wanted him murdered as soon as possible because Dunn would be going to court in a few weeks. Langford also indicated that Dunn was willing to meet the ATF UC anywhere to cover the details of the murder, and Dunn would be willing to provide a partial payment up front. At the conclusion of this meeting, Dunn placed a telephone call to Langford. Langford accepted the call while the ATF UC and CI-2 were present. Langford informed the ATF UC and CI-2 that Dunn was still in Ohio and apologized for not being at home. Langford also advised that Dunn wanted to meet the ATF UC. The parties arranged a meeting on October 30, 2006.

43. On October 30, 2006, the AFT UC and CI-2 met Dunn and Langford at Dunn's Boat Dock Road residence and then spoke with Dunn to further discuss the plot to kill the PCSO UC. During the meeting, Dunn confirmed the identity of the person they wanted killed. Dunn went to his residence to retrieve a police report, which had the PCSO UC's name on it, but later returned without the report, stating that he could not locate it. Upon his return, Dunn engaged in several minutes of conversation with the ATF UC in Dunn's driveway, discussing ways in which Dunn would want the PCSO UC killed. Dunn indicated he would rather have him shot than blown up. The ATF UC asked Dunn why he wanted the undercover killed. Dunn responded that the PCSO UC and others had set him up.

44. An agreement was reached to kill the PCSO UC for $15,000 in cash. The ATF UC requested partial payment, and Dunn indicated that he had a half ounce of cocaine and about $300 in cash. The ATF UC agreed to accept the partial payment and arranged to meet Dunn in three days. The ATF UC asked Dunn several times if he was sure he wanted the undercover killed, and Dunn stated that he was 'commited to it.' Dunn went into his residence and returned with Langford. He gave CI-2 fifteen grams of cocaine and a roll of currency amounting to $300.

45. Later on October 30, 2006, both Ms. Langford and Mr. Dunn were arrested and detained. Dunn gave consent for officers to search his residence. Found at the defendant's residence were 646.8 grams of marijuana, 309 grams of marijuana in soil and with root system, 475 [sic]

46. Mr. Dunn was interviewed and provided very vague statements regarding the solicitation plot.

47. Officers subsequently interviewed Langford, who confessed to the murder for hire plot. Langford provided a post-Miranda admission, wherein she stated, in sum and substance, that she was a full participant in the scheme to murder the PCSO UC. Langford also admitted that the motivation for his murder was to prevent him from testifying in court against her and Dunn. Langford stated that the scheme had started approximately one or one and a half months prior, when Dunn received papers from his lawyer indicating that CI-1 and the PCSO UC had set them up.

Langford was not under indictment for the state charges, but she stated that Dunn had shown her 'papers' where her name also appeared and that the PCSO UC's murder would benefit them both. Langford admitted that she sold the PCSO UC cocaine on three occasions. Langford provided a written statement and a list of thirty individuals to whom she had sold marijuana and cocaine in the previous two years.

48. While Dunn was detained and awaiting trial for the controlled buys and first murder for hire scheme, he wrote several letters in attempts to obstruct justice. He encouraged Langford to withhold testimony, discussed his anticipated defense theories, and referenced his efforts to hire someone to kill CI-2, the PCSO UC, and the ATF UC.

49. Specifically, Dunn wrote several letters to Robin Welch. Ms. Welch was one of Brian Matheny's ex-girlfriends. The letters revealed the defendant's second murder plot to kill the PCSO UC as well as murder plots to kill CI-2 and the ATF UC. The letters included numerous directions from Dunn to Welch in the furtherance of the murder plots. The first part of the plot was to have Welch bail out fellow prisoner, Eddie Knuckles. Knuckles was to be Dunn's hit man. Welch was to contact Alan Arnold, Dunn's former bondsman, and to have Arnold bail out Knuckles for a discounted fee. The defendant suggested burning down the Beehive Restaurant and using the insurance money, engaging in a check writing fraud, and or borrowing the money from Dunn's parents as a means of gathering funds to bail out Knuckles.

50. Once Knuckles was bailed out, Welch was to provide him with a rental car; the addresses of the PCSO UC, CI-2, and the ATF UC; leg shackles; handcuffs; and a taser. On December 13, 2006, Dunn wrote Welch about the possibility of hiring an out of town private investigator to run the plate number for the name and address on the ATF UC's vehicle. He wanted Welch to tell the private investigator that the person driving the vehicle had been stalking her and she wanted to know who it was. In addition, he advised Welch to look up a limousine company in Nashville and provide them with the ATF UC's phone number. Welch was to advise the limousine company that the ATF UC had been picked at random to receive a four hour limousine ride. Welch was to pay for the time and tell the person working there to get the address so that the certificate for the free limousine ride could be sent to them. Dunn also noted that the limousine company would have Welch sign a contract for this service and that the ATF UC's address should be on the contract. Welch was to remain anonymous and provide them with a fake name.

51. On December 14, 2006, Dunn instructed Welch to provide information to Knuckles regarding addresses and phone numbers for the PCSO UC, the ATF UC, and CI-2.

52.    On December 19, 2006, Dunn wrote Welch about his efforts to talk his father into bailing out his 'business partner.' He spoke of getting Knuckles out of jail and giving him a little money. He also indicated that he needed money to get Knuckles a car, for Knuckles' bail, and for a place for Knuckles to rent.

53.    Around December 2006 to January 2007, Knuckles met with the defendant while both were incarcerated in the Davidson County Criminal Justice Center. Dunn asked Knuckles to engage in criminal conduct. Dunn wanted Knuckles to 'get rid' of two 'police officers.' Knuckles understood Dunn to mean that he wanted these two individuals killed. Dunn reportedly told Knuckles that the two people had evidence against him and that was why he wanted them 'gone.' Dunn provided Knuckles information regarding the vehicles these individuals drove. He advised Knuckles that he would need a taser and that he would acquire one for him. Dunn told Knuckles he was asking his parents to get money, so that he could bond Knuckles out of jail. Dunn drew up several maps and diagrams of the Cookeville police station, including the layout where one could see the police officers. Knuckles believed Dunn was serious about the request. Originally, Dunn wanted the police officers kidnapped. Later, he changed his mind and told Knuckles that he wanted the police officers killed. Dunn told Knuckles that he also had other people that would help Knuckles once he got out of jail.

54.    In addition, Dunn wrote Brian Matheny several letters while Dunn was detained and awaiting trial. Through his letters, he requested Matheny to testify that he (Matheny) had offered to kill the PCSO UC for free, but that Dunn refused. Dunn explained that his refusal negated a conspiracy because there was no agreement; therefore, neither Dunn nor Brian Matheny could be guilty of a conspiracy and Brian would provide Dunn the defense of being able to argue that Dunn would not pay someone to kill the PCSO UC when Brian Matheny was willing to do it for free.

55.    As it relates to the defendant's drug distribution, Misty Langford testified that the defendant kept illegal substances and numerous pills in the residence they shared. She noted that she had seen him sell these pills to other individuals and that she sold them for him. Ms. Langford also advised that the defendant went to Mexico and Belize a couple of times a year and bought large quantities of drug tablets. Ms. Langford also noted he hid the tablets in his grandmother's prescription bottles as well as Rolaids containers.

56.    In addition to the drug distribution noted above, according to Ms. Langford, the defendant traded approximately 30 boxes of pseudoephedrine for the Norinco machine gun.

(Docket No. 344, at 10-15, in Case No. 2:06-00019).

III.  <u>Analysis</u>

A.  <u>The Petitioner's Claims</u>

The Petitioner claims that his convictions and sentence should be vacated on the following

grounds:

- Petitioner's Fifth Amendment and Sixth Amendment rights were violated when Co-Defendant Langford, confidential informants J.C. Harville, Jr. and Brian Matheny, and ATF Agent Wayne Kilday elicited incriminating information from the Petitioner outside the presence of counsel (Claims 1-5);

- Petitioner's Fourth, Fifth, and Sixth Amendment rights were violated when officers illegally entered and searched his residence on April 24, 2006, April 25, 2006, and October 30, 2006 (Claims 6-9);

- Petitioner's Fifth and Sixth Amendment rights were violated by the Government's failure to comply with discovery obligations (Claim 10);

- Petitioner's Fifth and Sixth Amendment rights were violated by the seizure and destruction of his computers and computer equipment (Claim 11);

- Petitioner's Fifth Amendment right prohibiting double jeopardy was violated by his sentence for multiple crimes involving machine guns, and by consecutive sentences for multiple violations of 18 U.S.C. § 924(c) (Claims 12-13);

- Petitioner's Fifth and Sixth Amendment right to effective assistance of counsel and a fair trial were violated before and during the trial and on appeal (Claims 14-55).

B.  <u>The Section 2255 Remedy</u>

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to

have their sentence vacated, set aside or corrected.[1]   The statute does not provide a remedy,

_____

[1]  28 U.S.C. § 2255 states, in part:

A prisoner in custody under sentence of a court established by Act

however, for every error that may have been made in the proceedings leading to conviction. "'To warrant relief under section 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict.'" Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005)(quoting Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner is not entitled to relief. 28 U.S.C. § 2255(b); Ray v. United States, 721 F.3d 758, 761 (6th Cir. 2013); Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. Where the same judge considering the Section 2255 motion also presided over the underlying criminal proceedings, the judge may rely on his own recollection of those proceedings. Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 1629 n.4, 52 L.Ed.2d 136 (1977); Ray, 721 F.3d at 761.

The Court has reviewed the pleadings, briefs, transcripts, and records filed in Petitioner's underlying criminal case, as well as the pleadings, briefs, transcripts, and records filed by the parties in this case. The Court finds it unnecessary to hold an evidentiary hearing because these records conclusively establish that Petitioner is not entitled to relief on any of the issues raised,

---

of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

with the exception of the double jeopardy claim regarding Count 13, and resolution of that issue

does not require an evidentiary hearing.

C.  Statute of Limitations

In its Motion To Dismiss (Docket No. 38), the Government contends that the Petitioner's

Motion is barred by the one-year statute of limitations applicable to actions brought pursuant to

28 U.S.C. § 2255.  Subsection (f) of Section 2255 establishes the one-year limitations period:

> (f) A 1-year period of limitation shall apply to a motion under this section. The
> limitation period shall run from the latest of--
>
>> (1) the date on which the judgment of conviction becomes final;
>>
>> (2) the date on which the impediment to making a motion created
>> by governmental action in violation of the Constitution or laws of
>> the United States is removed, if the movant was prevented from
>> making a motion by such governmental action;
>>
>> (3) the date on which the right asserted was initially recognized by
>> the Supreme Court, if that right has been newly recognized by the
>> Supreme Court and made retroactively applicable to cases on
>> collateral review; or
>>
>> (4) the date on which the facts supporting the claim or claims
>> presented could have been discovered through the exercise of due
>> diligence.

The parties appear to agree that Subsection (f)(1) applies here.  According to the Sixth

Circuit, the "date on which the conviction becomes final," under Subsection (f)(1), means "at the

conclusion of direct review." 28 U.S.C. § 2255; Sanchez-Castellano v. United States, 358 F.3d

424, 426 (6th Cir. 2004). When a defendant files a petition for writ of certiorari in the Supreme

Court, the judgment of conviction becomes final for purposes of Section 2255 when the Supreme

Court either affirms the conviction on the merits or denies the petition for a writ of certiorari.

Clay v. United States, 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003); Johnson v.

United States, 457 Fed. Appx. 462, 2012 WL 171379 (6th Cir. Jan. 23, 2012).

In the Petitioner's case, the Supreme Court entered its order denying his petition for writ of certiorari on October 2, 2012. (Docket No. 377 in Case No. 2:06-00019). Petitioner's Motion in this case was filed on October 18, 2013, but was signed and dated on September 30, 2013. (Docket No. 1).

The Petitioner contends that his Motion was filed within the one-year limitations period because as a *pro se* prisoner, his legal documents are deemed to be filed when the prisoner delivers the document to prison officials for mailing. The Government argues that the Petitioner cannot benefit from this "prisoner mailbox rule" because he did not use the prison's legal mail system to mail his Section 2255 Motion.

Under the "prison mailbox rule," a *pro se* prisoner's complaint is deemed filed when it is handed over to prison officials for mailing to the court. See, e.g., Brand v. Motley, 526 F.3d 921, 925 (6th Cir. 2008); Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). The Sixth Circuit has explained that courts have expanded the understanding of this rule by assuming that, absent contrary evidence, a prisoner is deemed to have filed a complaint on the date he or she signed it. Brand, 526 F.3d at 925.

Petitioner's Motion is dated September 30, 2013, and includes the Petitioner's signature and date after the following statement:

> Certificate of Service
> I do hereby certify that the foregoing Motion Pursuant to 28 USC § 2255 was delivered to USP2 Staff for delivery via United States Postal Service, First Class and postage prepaid, to the Clerk of the Court, US District Court, 801 Broadway - Room 800, Nashville, TN on this the 30th day of September, 2013.

(Docket No. 1, at 8).

To support its position that the prison mailbox rule should not apply here, the Government has filed the affidavit of a prison employee stating that Petitioner's mailing was not listed in the mail logs at the prison during the relevant time period, and was not stamped as "legal mail." (Docket No. 38-1). The Government alternatively argues that the two-week delay between the date Petitioner signed the Motion and the date it was received by the Court Clerk's Office suggests that Petitioner may have given his petition to prison officials after the expiration of the limitations period.

The Court is not persuaded that either of these arguments is sufficient to overcome the Petitioner's certification that he delivered the Motion to prison personnel for mailing on September 30, 2013. As that date was within the one-year limitations period, the Petitioner's Motion was timely filed. Therefore, the Government's Motion To Dismiss (Docket No. 38) on statute of limitations grounds is denied.

D.      Petitioner's Claims

        1. Sixth Amendment Claim Regarding Misty Langford – Claim 1

In Claim 1, Petitioner argues that his Sixth Amendment rights were violated when Co-Defendant Misty Langford acted as a government agent and elicited incriminating information from him after his right to counsel had attached. Petitioner contends that his right to counsel attached when he was indicted on drug charges by the State of Tennessee on April 10, 2006.

Once the adversary judicial process has begun, the Sixth Amendment guarantees a criminal defendant the right to have counsel present at all "critical stages" of the criminal proceedings, including interrogation by law enforcement officers. Montejo v. Louisiana, 556

U.S. 778, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009)(citing <u>Massiah v. United States</u>, 377 U.S. 201, 204-05, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)). That right is violated "when there [is] used against [the defendant] at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." <u>Massiah</u>, 377 U.S. at 206.

The right applies to "indirect and surreptitious interrogations" by government agents and informants, as well as those interrogations conducted in a police station. <u>Id.</u> The Supreme Court has found such " surreptitious interrogations" have occurred where the government "intentionally creat[ed] a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." <u>United States v. Henry</u>, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). For example, in <u>Maine v. Moulton</u>, 474 U.S. 159, 106 S.Ct. 477, 487-88, 88 L.Ed.2d 481 (1985), the Court held that the State violated the defendant's Sixth Amendment right to counsel when it arranged to record discussions between the defendant and an undercover informant about the defendant's pending charges and plans for a defense at trial.

In <u>Ayers v. Hudson</u>, 623 F.3d 301 (6th Cir. 2010), the Sixth Circuit applied these principles in holding that a defendant's Sixth Amendment right to counsel was violated when a jailhouse informant was allowed to testify regarding incriminating statements made by the defendant in response to questioning by the informant. In reaching its decision, the court determined that a restrictive definition of the term "government agent" would not be appropriate:

> We agree with those courts that do not limit agency in the *Massiah* context to cases where the State gave the informant instructions to obtain evidence from a defendant. As *Henry* illustrates, a *Massiah* violation can occur even where the State specifically instructs its informant '*not* to initiate any conversation with or

question [a defendant] regarding the [offense for which he had been indicted].' *Henry*, 447 U.S. at 266, 100 S.Ct. 2183 (emphasis added). '[I]t is not the government's intent or overt acts that are important; rather, it is the "likely ... result" of the government's acts.' *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004) (quoting *Henry*, 447 U.S. at 271, 100 S.Ct. 2183). Thus, we hold that although direct written or oral instructions by the State to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor.7 . . . A court must also analyze the facts and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency.8 *See Henry*, 447 U.S. at 271, 100 S.Ct. 2183 (indicating that a 'combination of circumstances is sufficient to support' a finding of agency); *Moulton*, 474 U.S. at 176, 106 S.Ct. 477; *see also Brink*, 39 F.3d at 423 (suggesting that a 'tacit agreement' may be sufficient to establish agency for *Massiah* purposes). To hold otherwise would allow the State to accomplish 'with a wink and a nod' what it cannot do overtly. This, the Sixth Amendment does not permit.

> 7 In this case, without reference to any case law, the state appellate court's lead opinion rejected Ayers' Sixth Amendment claim solely because it found 'no evidence in the record to support [Ayers'] contention that Hutchinson was instructed by [the detectives] to ask certain questions of [Ayers] in an attempt to elicit a confession.' *Ayers*, 2002 WL 31031675, at *7 (Corrigan, P.J., lead opinion). As explained above, this succinct analysis is not dispositive of the issue and demonstrates that at least one of the two state appellate judges that voted to affirm Ayers' conviction misapplied clearly established federal law.

> 8 Moreover, a defendant is not required to set forth direct evidence to show a Sixth Amendment violation. As the Supreme Court stated in *Moulton*, because '[d]irect proof of the State's knowledge will seldom be available,' all that is needed to establish a Sixth Amendment violation is 'proof that the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel[.]' *Moulton*, 474 U.S. at 176 n. 12, 106 S.Ct. 477 (citation and internal quotation marks omitted).

Ayers, 623 F.3d at 311-12 (emphasis added).

Petitioner first argues that Ms. Langford deliberately elicited consents, waivers and statements from him on April 24, 2006 in violation of his Sixth Amendment rights. As noted above, on April 24, 2006, after a state investigation of drug trafficking in Putnam County,

16

Tennessee, law enforcement officers arrived at the home of the Petitioner to arrest him pursuant to a state indictment for cocaine sales. (Docket No. 73, at 1, in Case No. 2:06-00019). After a lengthy evidentiary hearing about the events of that day, the Court ruled in the underlying criminal case that the Petitioner validly consented to the search of the Boat Dock Road property and 560 Ruby Road, and validly waived his *Miranda* rights three separate times. (Docket Nos. 59 and 68, at 273-283, in Case No. 2:06-00019). The Sixth Circuit later affirmed that determination. (Docket No. 374, at 2-3, in Case No. 2:06-00019).

Petitioner's allegation that Ms. Langford was working as an agent of law enforcement on April 24, 2006, and in that capacity, persuaded the Petitioner to consent to searches and to making statements is not supported by the record in this case or the underlying criminal case. Nothing in the record or Petitioner's filings indicate that there was an express or implied agreement between federal or state agents and Ms. Langford sufficient to support a finding of agency on April 24, 2006. Petitioner's citations to the record indicate only that Ms. Langford spoke with Putnam County Sheriff's Department Detective Randy Roland at some point prior to April 24, 2006, and expressed a desire to become an informant. (Docket No. 309, at 399-405; Docket No. 311, at 827-831; Docket No. 312, at 1093-94; Docket No. 313, at 1133-38; Docket No. 276 (Government's Motion For Downward Departure) in Case No. 2:06-00019). The Petitioner has cited no evidence to indicate that Ms. Langford actually followed through with that expressed desire prior to April 24, 2006. The record indicates, at most, that Ms. Langford may have given a statement to Detective Roland on April 24, 2006. (Docket No. 311, at 828-30, in Case No. 2:06-00019; Docket No. 276 in Case No. 2:06-00019 (Motion For Downward Departure)). Giving a statement to police does not create an agency relationship. Furthermore,

the record is devoid of evidence to connect Ms. Langford's interactions with Detective Roland and the Petitioner's voluntary decisions to consent to search and make statements to law enforcement officers.

Petitioner next argues that Ms. Langford elicited incriminating statements from him in violation of his Sixth Amendment rights during the period between April 24, 2006 and October 30, 2006, the date he was arrested on the federal drug trafficking and solicitation to murder charges. Petitioner has failed to clearly identify any incriminating statements he made to law enforcement during this period. Although the Petitioner contends that Ms. Langford induced him to speak with Detective Roland and another law enforcement officer, and cites his phone records as reflecting those contacts, he goes on to state: "[t]hough *none of Dunn's messages were returned*, Langford certainly earned her stripes for inducing Dunn's attempts to communicate with law enforcement." (Docket No. 129, at 43 (emphasis added)). Furthermore, Petitioner has not shown that Ms. Langford's alleged efforts to urge him to speak with law enforcement officers during this period were motivated by anything more that a desire to improve their legal situation through cooperation.

Petitioner also contends that, during this time, Ms. Langford deliberately elicited statements from him which formed the basis of the federal solicitation to murder and drug trafficking charges. In order words, Petitioner claims that Ms. Langford was acting as a government agent when she, along with the Petitioner, solicited the murder of a Putnam County Deputy Sheriff. Petitioner's allegations are not supported by the record. Ms. Langford's actions, and interactions with the Petitioner, were not condoned or contemplated by law enforcement. Rather, the statements made by the Petitioner and Ms. Langford during this time arose out of

their personal relationship, and their status as co-defendants on state drug charges.

Petitioner also contends that Ms. Langford, acting as a government agent, elicited his consents, waivers and statements on October 30, 2006, in violation of his Sixth Amendment rights. As noted above, on October 30, 2006, the Petitioner was arrested on federal charges. As with the prior allegations, the Petitioner has cited no persuasive evidence suggesting that Ms. Langford was acting as a government agent during this time, or that his voluntary decision to enter into consents and waivers, or otherwise make incriminating statements, on October 30, 2006, was motivated by her "demands and threats." (Docket No. 129, at 46).[2]

Finally, Petitioner argues that Ms. Langford's influence led him to write letters to her while they were both incarcerated and awaiting trial on the federal charges, in violation of his Sixth Amendment rights. The Government introduced over 65 of these letters through Ms. Langford at trial. (Docket No. 311, at 740-902; Docket No. 312, at 929-1120; in Case No. 2:06-00019). The suggestion that Ms. Langford somehow tricked the Petitioner, or otherwise persuaded him to write these letters, however, is completely undermined by a review the content and tone of the letters; the Court's observation of the demeanor of Ms. Langford during her

---

[2]  Petitioner cites the following statement, and other similar statements, made by Ms. Langford to Detective Roland during the interrogation after her arrest on October 30, 2006 to support his argument that she was acting in an agency relationship with Detective Roland:

> Before we start can I tell you something. I think you already know. I mean, yesterday you called my momma's house and I knew it was you. I knew the whole plan. . . I knew what was going on but I told Will to do it anyway. Cause I knew it was you.

(Government Exhibit 716, at 1, in Case No. 2:06-00019). What Ms. Langford meant by this statement is not clear, but the evidence indicates that she did not actually make contact with Detective Roland, as his subsequent response, and the entire transcript, makes clear: "Well if you knew what my number was the whole time why didn't you call to stop this?" (Id., at 62).

testimony at trial; and the other evidence introduced at the trial.[3] For example, in the following excerpts from the letters, the Petitioner directs Ms. Langford to follow his advice exclusively regarding her defense, and repeatedly asks her to provide him with certain information about the case:

> Just make sure you don't give him [Detective Roland] any free information. You have given them plenty of that. Just keep your mouth shut and have them contact my attorney, and I will handle it and try to get you out of that place, okay?

(Id., at 891).

> I just need you to trust me. Now, don't be writing me back about this stuff. I don't have a secure way for you to write back to me yet. I have a list of questions below, yes or no answers. Just number a page and answer them. I have copies of the questions, so just number the answers, okay, please. You can send these directly to me. I need you to keep your mouth shut until we are on the same page.

(Id., at 950).

> I got news for you. I am the only one you can trust here. That is the bottom line. I am the only one smart enough to navigate these waters.

(Id., at 960).

> Your lawyer does not need to know everything either. They cannot be trusted. Nobody can be trusted. . . . I am asking you again. Sit back, stay healthy, and leave the brain work up to me. Either trust me to do it, or rot in prison for most of your life.

(Id., at 963).

---

[3] Testimony from witnesses who knew both the Petitioner and Ms. Langford described a relationship in which the Petitioner was clearly in control. Brian Matheny testified that "Misty did nothing without Wyl's approval. . . I mean he was a control freak over her. I mean I don't see her doing anything without his, you know, approval." (Docket No. 313, at 1275-76, in Case No. 2:06-00019). Robyn Welch testified that "Misty was usually very quiet. Kind of stood there. She would take the lead from Wyl. Wyl was or is a very, you know, business orientated, so he's very assertive where Misty is not like that at all." (Docket No. 313, at 1330, in Case No. 2:06-00019).

So with one month to go, if you want me to be able to help us here, I need to know that every request I make will be granted. No excuses or bullshit. Make it happen. I asked for your discovery. Got excuses but no paperwork. I asked you over and over to write your lawyer a letter telling her to talk to nobody but you . . .I also know and think it is sad that you don't even know the damage you are creating by not listening to me. . . . Your lawyer and your mom will f _ _ _ this all up if you let them, so take them out of the loop and don't tell them about any letters from me or sending anything to my sister. . .

* * *

I learned a long time ago to never tell you anything at all anyway.

(Id., at 978-79, 981).

I just wish you were smart enough to realize that if you don't know by now that my IQ is about (sic) yours and your mother's and J Bird's all put together, then you don't know me at all, and I am afraid you don't know me at all.

(Id., at 992).

I gave you specific instructions that were very detailed. Easy, nowhere near impossible and in fact quite easy to accomplish. Of course also asking you to keep it all a secret as to not tip them off to what I had up our sleeve.

(Id., at 995).

I have begged you to keep your mouth shut, and you refuse, which is why I can't even tell you anything now because you still keep telling people shit when silence was the only thing that can help you, but you are selfish and you foolishly think you are smart enough to know what is best. You are not, and you don't. Do I say that to hurt you? Hell no. I love you. I don't want to hurt you ever, but to help you here, you need to recognize your limited intelligence, education, and sophistication. . . . I realize you are too selfish to consider that now, but being not too swift and only having a GED education and just being from Baxter, not to mention your family background and not ever leaving the state, making you unsophisticated and naive, plus young and inexperienced.

* * *

I just wrote a bunch of shit out for my new attorney who also informed me you would be testifying for the government. I hate having to write down stuff to make you look like a crack whore when you get on the witness stand.

(Id., at 997, 998).

21

Don't write the judge. Just don't. It won't help anyway. And don't talk to your lawyer just yet. We need to be on the same page first. I am sick of repeating myself. It is you and me against the world, bottom line. As for lawyers, mine did talk to yours. She refused to talk to him.

(Id., at 1021).

On top of all that, I need you not to talk to your lawyer about all this. If you even mention anything, it might show we write letters. Nobody told me not to write you, and I don't want anybody to tell me to stop. We need to know what's going on before we get all this info to the lawyer, so definitely don't be signing anything at least until I see it first. . .

(Id., at 1023).

Do not talk to your lawyer about any of this until I tell you to do so. Don't write the judge either, please. . . Please write me back the questions and answers together, please, Baby.

(Id., at 1033-34).

I have asked a million times for you to write the whole story to me, and you just refuse. . . . Don't tell your lawyer to talk to mine just yet. We have too much to work out first. Once we are on the same page, then we will tell them to get together.

(Id., at 1040).

I am smart enough not to trust my lawyer, any lawyer. That is why I have done all my own research. That way I know for sure and I cannot be fooled or tricked or outsmarted by the prosecution.

(Id., at 1051).

The Petitioner has failed to show that Ms. Langford deliberately elicited these statements in violation of his right to counsel. The Petitioner's attempt to transform Ms. Langford's decision to testify against him into a Sixth Amendment violation is unavailing.

### 2. Fifth Amendment Claim Regarding Misty Langford – Claim 2

Petitioner argues that the Fifth Amendment also prohibits Ms. Langford's actions in

influencing him to write letters to her while they were both incarcerated and awaiting trial on the federal charges.

The Fifth Amendment provides that an individual cannot be "compelled in any criminal case to be a witness against himself." To protect that right, the Supreme Court held in <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that suspects subject to custodial interrogation must be given notice of their Fifth Amendment right against self-incrimination, their right to counsel, and other rights. Once a suspect in custody has asked for a lawyer, he may not be subject to further interrogation until a lawyer has been provided or unless the suspect initiates a discussion. <u>See</u>, <u>e.g.</u>, <u>Edwards v. Arizona</u>, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

The term "interrogation" refers to "express questioning," as well as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. " <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Statements "given freely and voluntarily without any compelling influences" are not barred by the Fifth Amendment. 446 U.S. at 299-300.

Petitioner's Fifth Amendment claim fails because he has not shown that the statements he made in his letters were in response to "interrogation" by Ms. Langford. On the contrary, as the excerpts cited above indicate, the Petitioner's statements were freely and voluntarily given. The Petitioner has also failed to show that Ms. Langford was acting as the government when she and the Petitioner exchanged letters during their pretrial detention.

3. <u>Sixth Amendment Claim Regarding J.C. Harville (CI#2) and Wayne Kilday (ATF UC) – Claim 3</u>

Petitioner argues that the statements he made to J.C. Harville and Wayne Kilday on October 30, 2006, when they were purportedly negotiating the murder-for-hire of Putnam County Deputy Sheriff Jeffrey Cessna, were obtained in violation of his Sixth Amendment rights. According to the Petitioner, his right to counsel attached on the state drug trafficking charges in April, 2006, and therefore, Mr. Harville and Agent Kilday, in their capacity as government agents, were prohibited from "interrogating" him during their conversation on October 30, 2006.

The Sixth Amendment right to counsel is "offense specific," and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced. . . " McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991). As the courts have explained, "[l]law enforcement officials have a duty to investigate new or additional crimes that an indicted and represented defendant may have committed." United States v. Ford, 176 F.3d 376, 379 (6ᵗʰ Cir. 1999). Given that duty, "the Supreme Court has clearly established that law enforcement officials may question an indicted defendant who has invoked his right to counsel if the questioning relates to offenses other than those that form the basis for his/her indictment." Id. (citing McNeil v. Wisconsin, supra, and Maine v. Moulton, supra). Applying these principles in Ford, the court held it was not unlawful for law enforcement officials to arrange for an informant to converse with an indicted defendant about offenses other than those for which he had been indicted:

> Thus, if an informant 'deliberately elicits' incriminating statements relating to the charged offense, the defendant is entitled to suppression of those statements in the trial on the charged offense, but the Sixth Amendment raises no bar to the initiation of the interview itself or to the use of any statements that incriminate the defendant on uncharged offenses.

Id., at 380.

Thus, there is no Sixth Amendment bar to the admission of any statements the Petitioner made to Agent Kilday and Mr. Harville on October 30, 2006 regarding the murder-for-hire charges for which he had not yet been indicted. Indeed, the Petitioner's statements that day largely formed the basis for the murder-for-hire charges.

The Petitioner cites March v. McAllister, 573 Fed. Appx. 450 (6th Cir. July 21, 2014) to support his argument that all the statements he made during his conversation with Agent Kilday and Mr. Harville were inadmissible in his federal trial. In McAllister, the court concluded that a Sixth Amendment violation occurred when the government used the defendant's statements about a future plot to murder government witnesses as evidence of a "guilty mind" in the trial of the original murder charge for which he was already represented by counsel. Explaining that the Supreme Court had not opined "on this unusual factual scenario," however, the court held that the state appeals court had not unreasonably applied clearly established federal law in the Sixth Amendment area that would warrant the issuance of habeas corpus. Id., at 461.

In this case, unlike the factual scenario in McAllister, the Petitioner's trial involved both the murder-for-hire charges and the drug trafficking charges, and the statements the Petitioner made regarding plans to kill Deputy Cessna were not admitted to prove the Petitioner's "guilty mind" with regard to the drug charges, but rather to support the murder-for-hire charges. That the murder-for-hire negotiations involved cocaine does not mean the entire conversation related to the pending state drug trafficking charges. Indeed, a review of the 35-page transcript of the undercover conversation at issue reveals only four lines that arguably relate to the pending state drug trafficking charges:

| Kilday: | What, what did he [Deputy Cessna] do that's got you wanting to do this? I mean he told me. |
| --- | --- |
| Dunn: | Sold him some dope. |
| Kilday: | You sold him some dope? |
| Dunn: | So did she, so did a bunch of other people. |

(Docket No. 39-2, at 8).[4]

Given the overwhelming evidence of the Petitioner's guilt, the Court concludes that admission of these statements constitutes harmless error because the statements did not have a "substantial and injurious effect or influence in determining the jury verdict." Murr v. United States, 200 F.3d 895, 906 (6th Cir. 2000) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).[5] The other references to drug trafficking in the transcript do not relate to the pending state drug charges, but rather to the Petitioner's ability to pay for the murder-for-hire through the proceeds from current drug sales, or with the drugs themselves. (See Docket No. 129). Accordingly, the Petitioner's Sixth Amendment claim regarding the statements made to Mr. Harville and Agent Kilday is without merit.[6] Petitioner's argument that

---

[4] For purposes of this analysis, the Court assumes without deciding that the Petitioner's right to counsel had attached to the federal drug trafficking charges because they are the "same offense" as the state drug trafficking charges. (See Order entered June 18, 2007, at 4 n. 2 (Docket No. 73 in Case No. 2:06-00019)).

[5] To the extent the Petitioner contends that the "harmless beyond a reasonable doubt" standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) should apply in this Section 2255 action, the Court concludes that admission of the statements was harmless under either the Chapman or the Brecht standard. See, e.g., United States v. Smith, 723 F.3d 510 (4th Cir. 2013)(Court notes that all the courts of appeal have determined that the Brecht standard applies in Section 2255 actions as well as Section 2254 actions).

[6] Petitioner also appears to argue that the statements he made to Mr. Harville and Agent Kilday were involuntary. Petitioner has not shown, however, that his will was overborne, or that he was otherwise coerced, in making statements to individuals he believed were co-conspirators

any arrest or consent to search on October 30, 1996 was tainted by this alleged Sixth Amendment violation is also without merit.

    4. <u>Sixth Amendment Claim Regarding Brian Matheny – Claim 4</u>

Petitioner argues that admission of the statements he made to Brian Matheny in letters he wrote to Mr. Matheny while the Petitioner was incarcerated and awaiting trial on the federal charges violated his Sixth Amendment rights.

Mr. Matheny testified at trial that he and the Petitioner were involved in drug trafficking beginning in the fall of 2005. (Docket No. 313, at 1238-45, in Case No. 2:06-00019).  Mr. Matheny testified that, after the Petitioner was arrested on state drug charges in April, 2006, and received police reports from the prosecution, the Petitioner asked Mr. Matheny to help him kill Deputy Cessna. (<u>Id.</u>, at 1246-52).  Mr. Matheny said, in response, he told the Petitioner to stop talking about that. (<u>Id.</u>)

After the Petitioner was arrested in October, 2006 and while he was in pretrial detention, Mr. Matheny testified that he and the Petitioner exchanged letters. Mr. Matheny testified that in the letters sent to him, the Petitioner requested that Mr. Matheny testify that he had offered to kill Deputy Cessna for the Petitioner, but the Petitioner refused the offer. (<u>Id.</u>, at 1254-87). The Petitioner explained that this testimony would suggest that the Petitioner would not have agreed to pay Mr. Harville and Agent Kilday for the murder of Deputy Cessna when Mr. Matheny had

---

in a murder-for-hire plot. <u>See</u>, <u>e.g.</u>, <u>Illinois v. Perkins</u>, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)(Undercover police officer's questioning of a prison inmate did not implicate Fifth Amendment concerns as the suspect has "no reason to think that the listeners ha[d] official power over him. . ."); <u>United States v. Cope</u>, 312 F.3d 757, 773 (6th Cir. 2002). <u>Cf</u>. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)(Statements made to jailhouse informant in order to receive protection from physical violence by other inmates were coerced).

offered to murder the deputy for free. (Id., at 1259-61).

The Petitioner argues that Mr. Matheny "deliberately elicited" these letters while he was acting as a "government agent." Petitioner contends that Mr. Matheny was a government agent because Mr. Matheny knew that Detective Roland was interested in the Petitioner after the Petitioner was arrested in April, 2006. The Petitioner has failed to cite any evidence, however, supporting his claim that Mr. Matheny began working as an informant based on that knowledge.

Petitioner also points to Mr. Matheny's testimony that he contacted the TBI in February, 2007, to support his argument that Mr. Matheny was working for the government when he "elicited" the Petitioner's letters. Mr. Matheny testified at trial that he had pled guilty to drug trafficking in the Eastern District of Tennessee on April 8, 2008, and faced a nine-year sentence. (Docket No. 313, at 1232-37, in Case No. 2:06-00019). Prior to those charges, Mr. Matheny testified, he was arrested in January, 2007 in Rhea County and was released on bond, and he was arrested again in Davidson County in June, 2007 and was detained. (Id., at 1291-92). With regard to his contact with the TBI, Mr. Matheny testified as follows:

> I had before I was even arrested on June 12th, after my arrest on January 25th [2007] if that was the date, the 25th, I actually contacted the TBI myself in February before I even got arrested in June. So before I even wrote these letters, I had already told them everything in my – that had to do with my conspiracy, everything that I instructed Michelle to do. Of course none of this had to do with, you know, the defendant. It was my conspiracy in the Eastern District, you know what I mean, in Rhea County and in Chattanooga area, but I already cooperated with them and pretty much told them everything that, you know – That was long before my arrest in Nashville.

(Id., at 1301-02).

That Mr. Matheny provided statements to law enforcement regarding his conduct in the Eastern District of Tennessee did not turn him into a "government agent" for purposes of his

future communications with the Petitioner. Moreover, the fact that Mr. Matheny corresponded with the Petitioner after making the decision to plead guilty does not, without more, turn all post-decision conversations into a plot to "deliberately elicit" incriminating statements from the Petitioner. Simply put, the Petitioner wrote Mr. Matheny in an effort to enlist Mr. Matheny's help in extricating himself from his legal troubles, and the Petitioner's attempt to turn that those discussions into a Sixth Amendment violation is without merit.

     5.  <u>Fifth Amendment Claim Regarding Brian Matheny – Claim 5</u>

Petitioner argues that the Fifth Amendment also prohibits Mr. Matheny's "interrogation" of him through his letters. Petitioner has failed to establish, however, that Mr. Matheny was acting as the government when he wrote letters to the Petitioner, or that Mr. Matheny's letters were the equivalent of "interrogation" for Fifth Amendment purposes. Petitioner's statements to Mr. Matheny were freely and voluntarily given as part of an effort to enlist Mr. Matheny's help in Petitioner's defense.

     6.  <u>Fourth, Fifth and Sixth Amendment Claims Regarding Consents, Waivers and Statements on April 24, 2006 – Claim 6</u>

     7.  <u>Fourth, Fifth and Sixth Amendment Claims Regarding Search of Petitioner's Residence on April 25, 2006 – Claim 7</u>

     8.  <u>Fourth, Fifth and Sixth Amendment Claims Regarding Search of Petitioner's Residence and Private Closed Containers on April 25, 2006 – Claim 8</u>

     9.  <u>Fourth, Fifth and Sixth Amendment Claims Regarding Consents and Waivers on October 30, 2006 – Claim 9</u>

As noted above, after a lengthy suppression hearing in the underlying criminal case, the Court ruled that, on April 24, 2006, the Petitioner had validly consented to the search of the Boat

Dock Road property and 560 Ruby Road, and had validly waived his *Miranda* rights three

separate times. (Docket Nos. 59 and 73; Docket No. 68, at 273-283, in Case No. 2:06-00019).

The Court also ruled that Ruby Dunn, the Petitioner's grandmother, had validly consented to the

search of the Boat Dock Road residence on April 25, 2006, with the exception of the search of

the Petitioner's computers and the Petitioner's bedroom. (Id.)  The Court ruled that, on October

30, 2006, the Petitioner had again validly consented to a search of the Boat Dock Road property.

(Id.)  The Court ruled that all of the Petitioner's statements were admissible, except for those

made on October 30, 2006 after the Petitioner invoked his right to counsel and except for those

relating to the pending state drug charges.[7] (Id.)  The Sixth Circuit affirmed these determinations.

(Docket No. 374, at 2-3, in Case No. 2:06-00019).

Petitioner again challenges these determinations, but has provided no persuasive

argument or evidence in this proceeding that calls into question those previous decisions.

Petitioner continues to allege that Ms. Langford was a "government operative," and that her

status as such "markedly changes the entire dynamic" surrounding his actions on April 24, 2006.

(Docket No. 129, at 96).  For the reasons explained herein, there is no persuasive evidence

supporting the Petitioner's allegations regarding Ms. Langford.

Petitioner also alleges that Detective Roland committed perjury at the suppression

---

[7]  The Court ruled that the Petitioner's statements made in response to police questioning relating to the pending state drug charges were inadmissible based on Michigan v. Jackson, 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), which held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." Two years after this Court's ruling, the Supreme Court overruled Michigan v. Jackson, and held that a represented defendant may validly waive the right to counsel even in police-initiated custodial interrogation. Montejo v. Louisiana, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).

hearing because he testified that he did not seize a computer on April 24, 2006 from the Petitioner's home, when Government Exhibit 65B, introduced at trial, indicates otherwise. Government Exhibit 65B, introduced at trial, is a Putnam County Sheriff's Department Property Receipt, dated April 24, 2006, that reflects a Dell laptop computer was seized from the Petitioner's residence. Detective Roland testified at trial, however, that Exhibit 65B contained two errors: it should have been dated April 25, 2006, and it should not have listed the Dell computer because the computer was not actually seized that day. (Docket No. 309, at 373-74, 405-06, in Case No. 2:06-00019). According to Detective Roland, the computer was listed because he had planned to seize it, but after consulting with another detective, he decided not to seize it, and failed to delete it from the list of property seized. (Id.) Based on this testimony, the Court concludes that Detective Roland did not commit perjury at the suppression hearing based on the property receipt.

Petitioner also argues that Detective Roland committed perjury because his testimony about the computer was inconsistent with the Petitioner's testimony and the testimony of Sammie Worthington.[8] Alleged inconsistencies do not rise to the level of perjury, however, which requires a showing that the witness intentionally made false statements under oath, and that the testimony was material. See, e.g., United States v. Fields, 763 F.3d 443, 462 (6th Cir. 2014); United States v. Boring, 557 F.3d 707, 712 (6th Cir. 2009). Petitioner has not made this showing.

---

[8]  Ms. Worthington, who was at the residence on April 25, 2006, initially testified that a computer was seized (or so she "assumed") from the Petitioner's residence that day. (Docket No. 68, at 161, 174, in Case No. 2:06-00019). She later testified that an unnamed "taller fellow" was the person who had "touched" the computer, not Detective Roland. (Id.)

Petitioner contends that law enforcement authorities orchestrated a delay in his release from state custody to ensure he was not at his residence on April 25, 2006 when law enforcement officers conducted a search. According to the Petitioner, he was held in jail from April 24, 2006 to April 27, 2006 based on a "sheriff's hold" even though he had secured a bond. Petitioner has not established, however, that his three-day detention was improper, that it was in any way related to the search on April 25, 2006, or that it otherwise invalidated the consent of the Petitioner's grandmother, who owned the residence. See Fernandez v. California, ___ U.S. ___, 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014)(Warrantless search of defendant's apartment following his arrest and detention was valid based on consent of woman who shared the apartment; defendant's objection to search did not remain effective when he was no longer physically present; overruling United States v. Murphy, 516 F.3d 1117 (9th Cir. 2008)).

Petitioner argues that the search of his residence on April 25, 2006 was invalid because Ms. Worthington, his grandmother's caregiver, allowed the police into the residence even though she had no actual or apparent authority to do so. The evidence adduced at the suppression hearing indicates, however, that the *search* of the residence was based on the consent of the Petitioner's grandmother, Ruby Dunn, not Ms. Worthington, and that the police obtained consent from Ms. Dunn immediately after they entered the residence. Although Ms. Worthington may not have had authority to consent to the search, Petitioner has not shown that Ms. Worthington was without authority from Ms. Dunn to answer the door for her.

Petitioner argues that the black computer case seized by officers on April 25, 2006 in the living room of his residence was a "closed container" found in a private area of the residence for which his grandmother did not have the authority to consent to the search. Petitioner argued at

the suppression hearing that the scope of Ms. Dunn's consent was limited to certain areas of the residence, and the Court rejected those arguments, with the exception of the Petitioner's bedroom and his computers. (Docket No. 59; Docket No. 68, at 273-283; in Case No. 2:06-00019). Petitioner has raised nothing new that calls that decision into question.

Petitioner's other arguments regarding alleged inconsistencies in Detective Roland's suppression hearing testimony, and other challenges to the Court's determinations on the suppression issues, are similarly unavailing.

10.  The Government's Failure to Comply with Discovery Obligations – Claim 10

Petitioner argues that the Government violated its discovery obligations by failing to timely disclose the following: (1) Putnam County Sheriff's Department Property Receipt, dated April 24, 2006; (2) Detective Roland's Putnam County grand jury testimony; (3) Ms. Langford's "status as a confidential informant;" (4) Putnam County Sheriff's Department Offense Report dated February 27, 2004; (5) Petitioner's May 24, 2006 letter to the Department of Revenue contesting their seizure of his computers and other items; and (6) Petitioner's seized computers. Petitioner claims that these failures violate the Government's discovery obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Giglio v. United States, 405 U.S. 150, 92 S.Ct. 31 L.Ed.2d 104 (1972), the Jencks Act, 18 U.S.C. § 3500, and Federal Rules of Criminal Procedure 16 and 26.

Under Brady and Giglio, the Government is required to disclose all material, exculpatory evidence, including impeachment evidence, to a defendant. Failure to disclose such "material" evidence violates due process regardless of the good faith or the bad faith of the prosecutor. See, e.g., Wogenstahl v. Mitchell, 668 F.3d 307, 323 (2012).  To establish a successful Brady claim, a

habeas petitioner must show that: (1) the withheld evidence was favorable to the petitioner; (2) the prosecution suppressed the evidence, either purposely or inadvertently; and (3) the suppression resulted in prejudice to the petitioner. Id.; Stines v. United States, 571 Fed. Appx. 384, 388 (6th Cir. July 3, 2014). In order to show prejudice, a petitioner must demonstrate the evidence was "material." See, e.g., Jefferson v. United States, 730 F.3d 537, 550 (6th Cir. 2013). Evidence is material if a reasonably probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Wogenstahl, 668 F.3d at 323.

The standard is not met where the petitioner shows "merely a reasonable possibility that the suppressed evidence might have produced a different outcome." Id. Similarly, evidence that is "merely cumulative" of evidence presented at trial is not "material" for purposes of Brady. Stines, 571 Fed. Appx. at 388. For example, where the undisclosed evidence "merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence," the evidence may be cumulative. Jefferson, 730 F.3d at 550.

The materiality standard is less stringent with regard to claims that the prosecution knowingly solicited or allowed false testimony. The knowing use of false or perjured testimony constitutes a denial of due precess if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Wogenstahl, 668 F.3d at 323. To establish such a claim, the petitioner must show that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. Id.

Petitioner argues that the Government's failure to disclose the April 24, 2006 Putnam County Sheriff's Department Property Receipt prevented him from impeaching the testimony of Detective Roland at the May 2, 2007 suppression hearing where the detective testified that he did not seize a computer from the Petitioner's home. The Receipt was introduced by the defendant at a subsequent hearing, on September 26, 2008, to consider the Petitioner's motion to dismiss for spoliation of evidence. (Defendant's Exhibit No. 5; Docket No. 359, at 48-49, in Case No. 2:06-00019). The Receipt was also introduced at the trial as Government Exhibit 65B. (Docket No. 309, at 373-74, 405-06, in Case No. 2:06-00019). The Receipt reflects that a Dell laptop computer was seized from the Petitioner's residence. As noted above, Detective Roland testified at trial that the Receipt contained two errors: it should have been dated April 25, 2006, and it should not have listed the Dell computer because the computer was not actually seized that day. (Id.) According to Detective Roland, the computer was listed because he had planned to seize it, but after consulting with another detective, he decided not to seize it, and failed to delete it from the list of property seized. (Id.)

The Petitioner has failed to establish a <u>Brady</u> violation regarding the Receipt because he has not demonstrated that the evidence was "material." Assuming that the Petitioner had the Receipt prior to the suppression hearing and had introduced it to impeach the testimony of Detective Roland, the Detective likely would have simply explained that the Receipt contained the errors he described at trial. Petitioner has not shown that introduction of the Receipt would have undermined Detective Roland's credibility. In any event, the Court is not persuaded by Petitioner's underlying premise – that there was "material" evidence on the computers that the prosecution allegedly sought to destroy. Although the Petitioner persists in claiming that his

computers contained important evidence, he does not specify the exact nature of that evidence, or how it would have specifically benefitted the defense during his criminal prosecution. As the Sixth Circuit stated in rejecting the Petitioner's <u>Brady</u> claim on appeal:

> The police have a duty to preserve exculpatory evidence, *see California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and a limited obligation 'to preserve evidence ... [that] could form a basis for exonerating the defendant.' *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In this case, Dunn cannot establish that the police breached either of these duties because he has not demonstrated that the information contained on the computers was either exculpatory or potentially helpful. The only specificity that Dunn provided about what was on his computers was that they contained information about 'some questionable police conduct' such as 'comments that were made' during controlled drug buys and 'things that the [confidential] informant did' during those buys. Hr'g Tr. 233, May 2, 2007, ECF No. 68. The statements he cites in his letters to his girlfriend are equally vague (e.g., he asserts that the tapes will tell the truth and play the tapes if others lie.) Dunn has not established that the computer information had an apparent exculpatory value; thus, his *Brady* claim fails.

<u>United States v. Dunn</u>, <u>supra</u>, at *2.

Next, Petitioner claims that Detective Roland's Putnam County grand jury testimony was subject to disclosure but was withheld. Beyond this bare allegation, the Petitioner has failed to specify how the prior testimony was favorable to him, or material to his defense.

Petitioner also claims that the Government failed to disclose Ms. Langford's "status as a confidential informant" after her arrest on April 24, 2006. This claim assumes that Ms. Langford was, in fact, acting as a confidential informant during the time alleged. As discussed above, however, Petitioner has failed to support this claim with credible evidence. As there was no "fact" to disclose, Petitioner's <u>Brady</u> claim fails.

Petitioner claims that the Government failed to disclose Putnam County Sheriff's Department Offense Report dated February 27, 2004 prior to the suppression hearing. That

Report, according to the Petitioner, supports his suppression hearing testimony that Detective Roland searched his house in 2004. (Docket No. 68, at 185-88, in Case No. 2:06-00019). The Report was introduced by the Petitioner at the subsequent hearing on spoliation of evidence. (Defendant's Exhibit 8; Docket No. 359, at 52, in Case No. 2:06-00019).

Petitioner testified at the suppression hearing that he first met Detective Roland when the Detective searched his house in 2004. (Docket No. 68, at 185, in Case No. 2:06-00019). During the search, the Petitioner testified, he recorded Detective Roland and provided the detective with a copy of the recording. (Id., at 186-87). The Petitioner further testified that he told Detective Roland that his grandmother had suffered from a stroke, and he did not want to upset her. (Id., at 187-88). Detective Roland testified at the suppression hearing that he may have accompanied Detective Burgess when he visited Petitioner's house prior to 2005, but could not recall any details. (Id., at 44-46).

The Report at issue reflects that Putnam County Sheriff's Department Officers conducted a search of the Petitioner's residence on February 27, 2004, but does not mention Detective Roland. The Report indicates that the search was conducted by Officers Whittaker, Burgess, and Whitefield. Therefore, Petitioner's claim that the Report verifies that the search "happened exactly as Dunn described" is inaccurate (Docket No. 129, at 140). In any event, even if the Report had mentioned Detective Roland, the Petitioner has failed to establish that the Report was "material." Assuming that the Petitioner had the Report prior to the suppression hearing and had introduced it to impeach the testimony of Detective Roland, the Detective likely would not have changed his testimony regarding his memory of the encounter, and the Petitioner has not otherwise shown that introduction of the Report would have undermined Detective Roland's

credibility. Moreover, the ultimate points the Petitioner was apparently trying to make with his testimony – that Detective Roland knew the Petitioner had recorded the previous search, and that he knew the Petitioner's grandmother had suffered a stroke – were fully considered by the Court at the suppression hearing. The Report would have added little or nothing to advance the Petitioner's claims.

The last two Brady claims made by the Petitioner relate to the alleged seizure of his computers. Petitioner argues that the Government failed to disclose Petitioner's May 24, 2006 letter to the Tennessee Department of Revenue ("TDR") contesting the seizure of his computers and other items, which would have undermined the testimony of TDR employees that they did not receive any objection from the Petitioner before they erased the data on the computers and sold them. Petitioner further argues that the Government committed a Brady violation by failing to preserve the evidence stored on the computers.

To support his argument, the Petitioner has filed a letter addressed to him from a TDR Administrative Hearing Officer, dated February 23, 2007, which analyzes the validity of the Department's tax assessment based on the Petitioner's possession of marijuana, cocaine and pills. (Docket No. 134-3, at p. 29). The first paragraph of the letter states "To challenge the assessment, you requested an informal conference by letter sent via facsimile on May 24, 2006." (Id.)

As noted above, the Court held a lengthy evidentiary hearing on September 26, 2008 during which TDR employees and other witnesses testified. (Docket No. 359 in Case No. 2:06-00019). The TDR witnesses testified that they did not receive any notice that the Petitioner contested the seizure or the sale of the computers and other assets seized from the Petitioner.

(Id.)  At the conclusion of the hearing, the Court ruled as follows:

> On the motion dealing with the spoliation of the evidence, of course I have considered the documents that Mr. Gonzalez [Petitioner's attorney] has submitted as exhibits. And I have also considered the testimony of the witnesses that we had, including Mr. Slatton and Ms. Sullivan and Mr. Cooper and Ms. Dudney. And there were, as I said numerous documentary exhibits starting with the transcript of the prior hearing to Ms. Langford's interview and various reports and inventory of items seized and all of those matters that I won't try to itemize now. This really turns on the issue of bad faith. In a word, it really turns on whether the Tennessee Department of Revenue destroyed the information of the computers in bad faith and whether those actions if they occurred should be attributed to the Putnam County Sheriff's Department and in turn to the prosecution of this case.

> My analysis of the evidence presented is that the Tennessee Department of Revenue didn't destroy the information on the laptops with bad faith. They testified that they didn't have any knowledge of what was on there at all, so it wasn't any effort to destroy evidence so I don't think it was in bad faith. I think it was unwise. I really question the judgment of law enforcement agencies that start destroying things seized in a criminal investigation. It is unwise, perhaps negligent, and it is frankly just perplexing why the drive for forfeitures is overriding the judgment of whether there could be a negative impact on criminal cases. I am reserving judgment on whether a jury instruction is appropriate. I want to get a better context of weighing the probative value of things and the evidence actually presented. I am going to ask Mr. Gonzalez since he is suggesting such an instruction to draft a proposed instruction, and then I will consider it as the proof comes in. Of course, the government can draft one as well. I am not saying I am going to give it or not give it. I am saying I can't make that judgment at this time. It would help to see particular language. To me, it is just really odd that somebody is destroying evidence that's been seized.

(Docket No. 359, at 181-83, in Case No. 2:06-00019).

The Petitioner has failed to establish a Brady violation regarding the February 23, 2007 letter because he has not demonstrated that the evidence was "material." Assuming that the defense had the letter, which was addressed *to the Petitioner*, prior to the spoliation hearing and had introduced it, there is little likelihood it would have affected the Court's conclusion that the TDR did not destroy the evidence on the computers in bad faith, or that the TDR's conduct should not be attributed to the Putnam County Sheriff's Department or the prosecution.

Furthermore, as discussed above, the Petitioner has failed to establish that there was "material" evidence on the computers that the prosecution allegedly sought to destroy.

Accordingly, the Petitioner's <u>Brady/Giglio</u> claims are without merit. Although the Petitioner cites Federal Rules of Criminal Procedure 16 and 26 and the Jencks Act in the heading to Claim 10, he has failed to explain why he is entitled to relief in this Section 2255 action based on the alleged violations of these provisions. Accordingly, these claims are also without merit.

11.  <u>The Government's Seizure and Destruction of Petitioner's Computers and Computer Equipment – Claim 11</u>

Petitioner claims that the Government violated his Fifth and Sixth Amendment rights to due process and a fair trial, and his Fourth Amendment right to be free from unreasonable searches and seizures, when it seized and destroyed his computers and computer equipment on April 25, 2006, and after his arrest on October 30, 2006. As discussed above, the Court held a lengthy evidentiary hearing on the seizure of the computers prior to trial, and concluded that the Petitioner had not shown that the TDR destroyed the evidence on the computers in bad faith, or that the TDR's conduct should be attributed to the Putnam County Sheriff's Department or the prosecution. Petitioner has not provided any factual or legal basis for reconsidering that conclusion.

Furthermore, as discussed above, the Petitioner has failed to establish that there was "material" evidence on the computers that the prosecution allegedly sought to destroy. Petitioner contends in his brief that the data destroyed included "a treasure trove of exculpatory evidence." (Docket No. 129, at 146).  Petitioner then provides details, over several pages, of recorded conversations and files that were destroyed.  This detail comes some six years after the Petitioner's trial, and without independent evidentiary support, is not credited by the Court. As

discussed above, the description of the destroyed data that the Petitioner provided in the criminal case was fully considered by the Sixth Circuit on appeal, and that court found the described data lacked any apparent exculpatory value.

      12.  <u>Petitioner's Double Jeopardy Claim Regarding Counts 13, 14, 15 – Claim 12</u>

Petitioner argues that his convictions on Counts 13, 14 and 15 violate the Double Jeopardy Clause because they punish the same conduct in multiple counts. The Petitioner was charged in Count 13 with knowingly possessing a machine gun, identified as a Norinco, model SKS, 7.62 caliber, serial number 24008410K, in violation of 18 U.S.C. §§ 922(o), 924, and 2. (Docket No. 166 in Case No. 2:06-00019). Count 14 charged the Petitioner with knowingly receiving and possessing the same machine gun, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841, 5861(d), 5871, and 18 U.S.C. § 2. (<u>Id.</u>) Count 15 charged the Petitioner with knowingly possessing the same machine gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii). (<u>Id.</u>) The jury convicted the Petitioner of all three counts. (Docket No. 252 in Case No. 2:06-00019).

The Double Jeopardy Clause of the Fifth Amendment protects against three harms: second prosecution for an offense after initial acquittal; second prosecution for an offense after an initial conviction; and multiple punishments for the same offense. <u>See</u>, <u>e.g.</u>, <u>United States v. Davis</u>, 306 F.3d 398, 417 (6th Cir. 2002). The rule against "multiplicity," or charging a single offense in more than one count, is to prevent the third harm. <u>Id.</u> To determine if multiplicity exists, the court must first determine whether Congress intended to punish each statutory violation separately. <u>Id.</u>; <u>United States v. Angeles</u>, 2012 WL 1940344, at ** 5 (6th Cir. May 30,

2012). When congressional intent is unclear, the court applies the "general test" for compliance with the Double Jeopardy Clause, which asks "whether each provision requires proof of a fact which the other does not." Id. (quoting Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

As the Sixth Circuit has explained, "Using the same evidence to prove violations of two statutes does not violate *Blockburger*." Angeles, supra (quoting United States v. Swafford, 512 F.3d 833, 844 (6th Cir. 2008)). "When applying the *Blockburger* test, the court must look to the legal theory of the case or the elements of the specific criminal cause of action for which the defendant was convicted without examining the facts in detail." Id.

The Petitioner cites the decision of the Eighth Circuit in United States v. Mann, 701 F.3d 274, 285-86 (8th Cir. 2012), issued on December 6, 2012, to support his argument. In Mann, the court held that because possession of a machine gun, in violation of 18 U.S.C. § 922(o), was a lesser included offense of possession of a machine gun that is not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d), the defendant's convictions for both offenses violates the Double Jeopardy Clause.

The Sixth Circuit has not addressed this issue, but the Government has not articulated a meaningful distinction between the Petitioner's convictions on Counts 13 (possession of a machine gun) and 14 (possession of an unregistered machine gun), and the convictions at issue in Mann. Accordingly, the Petitioner's conviction on Count 13 should be vacated, and his sentence should be reduced by 10 years to a total sentence of 315 years of imprisonment. (Judgment, at p. 2 (Docket No. 338 in Case No. 2:06-00019)).

Petitioner's convictions on Counts 14 and 15, however, do not implicate the Double

Jeopardy Clause because each count requires proof of an element the other does not. Count 14 requires the prosecution to prove that the machine gun that was possessed was unregistered, which is not required for conviction on Count 15; and Count 15 requires the prosecution to prove that the machine gun was possessed in furtherance of a drug trafficking crime, which is not required for conviction on Count 14. Accordingly, the Petitioner's double jeopardy argument regarding Counts 14 and 15 is without merit.

13. Petitioner's Double Jeopardy Claim Regarding Counts 15 and 16 – Claim 13

Petitioner argues that his sentences on Counts 15 and 16 violate the Double Jeopardy Clause because they impose multiple punishments for violations of 18 U.S.C. § 924(c) that allege the same predicate offense. As stated above, Count 15 charged the Petitioner with knowingly possessing the Norinco machine gun, in 2005, in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii). (Docket No. 166 in Case No. 2:06-00019). The "drug trafficking crime" in Count 15 is alleged to be a violation of 21 U.S.C. §§ 841(a)(1), 841(c)(2), and 846.[9] (Id.) Count 16 charged the Petitioner with knowingly possessing a Raven, model MP25, .25 caliber, semiautomatic pistol, on April 24, 2006, in furtherance of a

_____

[9] Section 841(a)(1) provides that ". . . it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . ."

Section 841(c)(2) provides that "Any person who knowingly or intentionally – . . . (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance . . . [violates the Controlled Substances Act]."

Section 846 provides that "Any person who attempts or conspires to commit any offense [under the Controlled Substances Act] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). (Id.) The "drug trafficking crime" in Count 16 is alleged to be a violation of 21 U.S.C. §§ 841(a)(1) and 846. (Id.) The jury convicted the Petitioner of both counts, and the Court imposed separate, consecutive sentences on those counts. (Docket Nos. 252, 338-38 in Case No. 2:06-00019).

The evidence introduced at trial with regard to Count 15 showed that, in 2005, the Petitioner obtained the Norinco machine gun from Leon Hall in exchange for several boxes of Sudafed, which were to be used in the manufacture of methamphetamine. (Docket No. 311, at 768-774; Docket No. 314, at 1532-36; Docket No. 315, at 1704-05; in Case No. 2:06-00019). The evidence relating to Count 16 showed that, on April 24, 2006, the Petitioner possessed the Raven pistol at his residence to further his trafficking of cocaine and other controlled substances. (Docket No. 311, at 767-68, 786-84; Docket No. 309, at 361-67; Docket No. 315, at 1705; in Case No. 2:06-00019).

Petitioner's argument rests on the premise that both Count 15 and 16 rely on the same drug trafficking conspiracy as the predicate drug trafficking crime. As explained above, that premise is flawed as Counts 15 and 16 rely on separate and distinct facts supporting separate and distinct violations of Sections 841(a)(1) and 846 (and in the Case of Count 15, Section 841(c)(2)). Therefore, the Petitioner's Section 924(c) convictions do not violate the Double Jeopardy Clause. See, e.g., United States v. Chapman, 551 Fed. Appx. 850, 854 (6th Cir. Jan. 14, 2014). The cases cited by the Petitioner involved Section 924(c) convictions based on the same predicate offense, and as such, are inapposite. See United States v. Diaz, 592 F.3d 467, 470-75 (3rd Cir. 2010)(One of two Section 924(c) convictions vacated because they both relied on the same predicate drug trafficking offense); United States v. Washington, 106 F.3d 983, 1013-15

(D.C. Cir. 1997)(One of two Section 924(c) convictions vacated for each defendant because it was impossible to tell whether the jury relied on the same drug conspiracy as the predicate offense for each conviction); United States v. Sims, 975 F.2d 1225, 1233 (6th Cir. 1992)(Government indicted defendant on more than one Section 924(c) count for separate firearms based on same predicate offense); United States v. Privette, 947 F.2d 1259, 1262-63 (5th Cir. 1991)(same).

      14. Petitioner's Ineffective Assistance of Counsel Claims – Claim 14 through 55

Petitioner's remaining claims maintain that he received the ineffective assistance of counsel throughout his criminal proceedings. In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) counsel's performance fell below an objective standard of reasonableness; and (2) actual prejudice resulted from the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland, 104 S.Ct. at 2052; Ludwig v. United States, 162 F.3d 456, 458 (6th Cir. 1998). In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 104 S.Ct. at 2065.

In order to establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Id., at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., at 2052. The likelihood of a different result "must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624 (2011).

Claims 14 -39 – Through Claims 14 through 39, the Petitioner contends that trial and/or appellate counsel[10] were ineffective for failing to raise the claims set forth above: Claim 14 - Counsel Was Ineffective For Failing To Timely Litigate Claim 1; Claim 15 - Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 1; Claim 16 - Trial Counsel Was Ineffective For Failing To Timely Litigate Claim 2; Claim 17 - Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 2; Claim 18 - Trial Counsel Was Ineffective For Failing To Timely Litigate Claim 3; Claim 19 - Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 3; Claim 20 - Trial Counsel Was Ineffective For Failing To Litigate Claim 4; Claim 21 - Appellate Counsel Was Ineffective For Failing To Litigate Claim 4; Claim 22 - Counsel Was Ineffective For Failing To Timely Litigate Claim 5; Claim 23 - Appellate Counsel Was Ineffective For Failing To Litigate Claim 5; Claim 24 - Trial Counsel Was Ineffective For Failing To Properly Litigate Claim 6; Claim 25 - Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 6; Claim 26 - Trial Counsel Was Ineffective For Failing to Properly Litigate Claim 7; Claim 27 - Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 7; Claim 28 - Trial Counsel Was Ineffective For Failing To

---

[10]  Petitioner was initially represented in the underlying criminal proceeding by Joseph D. Baugh, Jr., who was replaced by Jerry Gonzalez prior to trial. After trial, at sentencing and on appeal, the Petitioner was represented by Hershell D. Koger. (Docket Nos. 7, 45, 46, 49, 257, 262 in Case No. 2:06-00019).

Properly Litigate Claim 8; Claim 29 - Appellate Counsel Was Ineffective For Failing To

Properly Litigate Claim 8; Claim 30 - Trial Counsel Was Ineffective For Failing To Properly

Litigate Claim 9; Claim 31 - Appellate Counsel Was Ineffective For Failing To Properly Litigate

Claim 9; Claim 32 - Trial Counsel Was Ineffective For Failing To Litigate Claim 10; Claim 33 -

Appellate Counsel Was Ineffective For Failing To Properly Litigate Claim 10; Claim 34 - Trial

Counsel Was Ineffective For Failing To Properly Litigate Claim 11; Claim 35 - Appellate

Counsel Was Ineffective For Failing To Properly Litigate Claim 11; Claim 36 - Sentencing

Counsel Was Ineffective For Allowing Dunn To Receive A Sentence That Violates The Fifth

Amendment Prohibition Of Double Jeopardy, To Wit, Multiple Sentences For Possessing A

Machine Gun [Claim 12]; Claim 37 - Appellate Counsel Was Ineffective For Failing To Litigate

Claim 12; Claim 38 - Sentencing Counsel Was Ineffective For Allowing Dunn To Receive A

Sentence That Violates The Fifth Amendment Prohibition Of Double Jeopardy, To Wit, Multiple

Sentences For Possession Of Multiple Weapons In Furtherance Of A Single Drug Trafficking

Conspiracy [Claim 13]; and Claim 39 - Appellate Counsel Was Ineffective For Failing To

Litigate Claim 13. (Docket No. 129, at 170-262).

With the exception of a portion of Claim 12, the Court has concluded that none of those

claims have merit. Therefore, had counsel raised those claims, they would not have been

successful.  Accordingly, the Petitioner has not shown that counsel was deficient in failing to

raise the claims, or that he was prejudiced by any failure to raise the claims. See, e.g., Ludwig v.

United States, 162 F.3d at 459 (Counsel is not required to raise meritless arguments to avoid a

charge of ineffective assistance of counsel); United States v. Pierce, 403 Fed. Appx. 988, 989 (6th

Cir. Dec. 15, 2010)(Prejudice not shown where Supreme Court had foreclosed argument

petitioner alleges counsel should have made); Rashad v. Lafler, 675 F.3d 564, 571 (6th Cir. 2012)(Petitioner failed to show that appellate counsel performed ineffectively by failing to raise meritless argument).

Through Claims 36 and 37, the Petitioner argues that trial and appellate counsel failed to raise Claim 12, i.e. that his convictions on Counts 13, 14 and 15 violate the Double Jeopardy Clause. As discussed above with regard to Claim 12, the decision in United States v. Mann, 701 F.3d at 285-86, indicates that Petitioner's convictions on Counts 13 and 14 violate double jeopardy protections, and therefore, Petitioner's conviction on Count 13 should be vacated, and his sentence should be reduced by 10 years.

The Court is not persuaded, however, that counsel was deficient for failing to raise this issue as the Eighth Circuit rendered its decision in Mann more than three years after Petitioner's sentencing hearing, and a year after the Sixth Circuit affirmed Petitioner's judgment. (Docket Nos. 338, 339, 374 in Case No. 2:06-00019). In any event, Claims 36 and 37 are moot as any failure by counsel to provide effective assistance on this issue is remedied by the reduction in Petitioner's sentence.

Claim 40 – Through Claim 40, Petitioner contends that the attorneys who represented him both before and after the federal case commenced – Jack Lowery, Samuel Harris, and Joseph Baugh – provided ineffective assistance by failing to secure the information that was lost in his computers and recording equipment. The Petitioner has failed to demonstrate prejudice regarding any failure by counsel to secure Petitioner's computers and recording equipment, however, because as discussed above, he has not shown that there was material evidence stored on the equipment.

<u>Claims 41 and 42</u> – Through Claim 41, Petitioner argues that trial counsel was ineffective for failing to investigate witnesses for his defense. Petitioner has identified several individuals he claims would have aided his defense, but he has failed to offer any admissible evidence, in the form of affidavits or otherwise, as to whether these witnesses would have been available for interview, or what the content of their potential testimony would have been. Accordingly, Petitioner has failed to establish that he was prejudiced by any failure of counsel to investigate these witnesses for the defense. <u>See</u>, <u>e.g.</u>, <u>Clark v. Waller</u>, 490 F.3d 551, 557 (6th Cir.2007).

Through Claim 42, the Petitioner argues that trial counsel was ineffective because he failed to call various witnesses to testify at trial. Petitioner specifically contends that counsel should have called Alanda Lewis, who was a former cellmate of Misty Langford and would have testified that "the murder plot was all Langford's plan and idea." (Docket No. 129, at 223).

Trial counsel was unable to secure Ms. Lewis's presence at the trial, but asked Ms. Langford about Ms. Lewis's expected testimony during cross examination. (Docket No. 313, at 1213-14, 1230-31, in Case No. 2:06-00019). Ms. Langford denied she made any such statements to Ms. Lewis. (<u>Id.</u>)

Ms. Lewis was called to testify at the Petitioner's sentencing hearing. (Docket No. 360, at 23- 42, in Case No. 2:06-00019). She testified that Ms. Langford told her that it was her own idea to have the police officer killed, and that the Petitioner does what Ms. Langford says. (<u>Id.</u>) At the conclusion of the hearing, the Court found that Ms. Lewis's testimony lacked credibility:

> . . . I sat through days and days and days of this trial. Ms. Lewis' testimony clearly contradicts the trial record. Ms. Lewis says that Misty Langford basically said that all of this was her idea to have the officer killed and that she was to get her brother to get a hit man and that Mr. Dunn's money and drugs would be used to pay the hit man secured by her brother to kill the officer.

Misty Langford's testimony at trial was to the contrary, which was she was carrying out Mr. Dunn's wishes. This is back to that issue of who is in charge; was Misty Langford the most culpable, or was Mr. Dunn most culpable? And I have seen the credibility of Ms. Lewis, and I have seen the credibility of Ms. Langford, and the Court's view is Ms. Langford was telling the truth and that Ms. Lewis is not credible. Mr. Dunn was in charge of these murder-for-hire plots. I don't have any doubt in my mind about it. He manipulated Misty Langford. She certainly was deeply involved. She did many things she shouldn't have done. She is criminally culpable. She has been sentenced, and I am not trying to diminish her responsibility. But the Court has no doubt that Mr. Dunn was the leader and organizer and the brains behind the criminal conduct, so I am crediting Misty Langford. I am not crediting Alanda Lewis. Both Misty Langford and Ms. Lewis have something to gain. I understand that. I am taking that into account. And but I am not – I don't find Ms. Lewis' testimony credible.

(Id., at 74-75).

Given the overwhelming evidence of the Petitioner's guilt, and Ms. Lewis's credibility problems, the Court is persuaded that Petitioner was not prejudiced by any failure of counsel to call Ms. Lewis as a witness as his trial. See, e.g., Foster v. Chillicothe Correc. Inst., 575 Fed. Appx. 650, 655-56 (6th Cir. Aug. 8, 2014).

Claim 43 – Through Claim 43, the Petitioner argues that trial counsel provided ineffective assistance by preventing the Petitioner from testifying at trial. Petitioner contends that trial counsel threatened to withdraw if Petitioner testified, or to refuse to object to any questions the Government asked him.

In statements made on at least two occasions during the trial, the Court made clear that the decision as to whether to testify was up to the Petitioner. On the seventh day of the trial, October 29, 2006, as the parties discussed the scheduling of witnesses, the Court asked Mr. Gonzalez if he had an estimate as to the expected length of time for his presentation of proof:

THE COURT: . . . Mr. Gonzalez, can you tell me – let me back up. Obviously you don't have to put on any proof, but if you are going to put on any proof, can you give me an idea of

|               |                                                                                      |
|---------------|--------------------------------------------------------------------------------------|
|               | what we are looking at in terms of time period?                                      |
| MR. GONZALEZ: | My psychologist has told me he won't be available until the afternoon. I have to try to narrow it down because obviously it is difficult to get hold of him because of the hours that I am here and the hours he works. I will try to get hold of him right after court today. I have one other witness, and he already knows, Agent Ridner I wanted to call. And the rest I can't answer that right now. |
| THE COURT:    | All Right. *Obviously Mr. Dunn has a right to testify if he wants to testify. If he doesn't want to testify, that's his right as well, and that's a decision you will make at the appropriate time.* |

(Docket No. 314, at 1622-23, in Case No. 2:06-00019)(emphasis added).

On the last day of the presentation of evidence, October 30, 2008, the Court and Mr.

Gonzalez discussed the defense's presentation of evidence as follows:

|               |                                                                                      |
|---------------|--------------------------------------------------------------------------------------|
| THE COURT:    | So you intend to offer the stipulations, putting Dr. Walker on as an expert?         |
| MR. GONZALEZ: | Correct.                                                                             |
| THE COURT:    | And has Mr. Dunn made the decision he does not want to testify?                      |
| MR GONZALEZ:  | Yes, sir.                                                                            |
| THE COURT:    | *All right. That's his right of course. He can testify if he wants to. If he does not want to, that's his right as well. Again, it is your choice.* |

(Docket No. 315, at 1629, in Case No. 2:06-00019)(emphasis added). After this discussion, Mr.

Gonzalez went on to present the defense evidence, which was followed by the Government's

rebuttal witness, closing arguments, and the jury charge. The Petitioner did not indicate any

disagreement with counsel's statement throughout the rest of that day.

Prior to the start of jury deliberations the next day, October 31, 2008, Mr. Gonzalez

advised the Court as follows: "Your Honor, this morning Mr. Dunn told me that he wanted the

Court to be aware that he wanted to testify and that I recommended against it. So for whatever that's worth, I am letting the Court know per his wishes." (Docket No. 316, at 1781, in Case No. 2:06-00019). The Court responded: ". . . I think the Court advised that the defendant had the right, and there was nothing said at the time. Well, the record is the record. My memory is I advised Mr. Dunn a number of occasions that he had the right to testify and he had a right not to testify. That was his choice. Let the record be preserved." (Id., at 1781-82). Mr. Gonzalez then explained: "For the record, I did tell him he has the right to testify and if he wanted to testify that I'd put him on the stand. I told him that very clearly including in the presence of two other attorneys." (Id., at 1782).

The jury went on to deliberate throughout that day, and after adjourning for the weekend, returned to continue deliberations on November 3, 2008. (Docket Nos. 247, 248, 317). The jury reached a verdict later that day. (Id.) The next day, November 4, 2008, the Court Clerk received and filed two letters from the Petitioner, one dated October 30, 2008, and the other dated October 31, 2008. (Docket Nos. 254, 255 in Case No. 2:06-00019). Through the letters, the Petitioner claimed that Mr. Gonzalez's statement to the Court about the Petitioner's decision not to testify was "not entirely true." (Docket No. 255 in Case No. 2:06-00019). The Petitioner claimed that all three of his attorneys compelled him not to testify, but that Mr. Gonzalez "blatantly threatened me." (Id.)

In response to the letters, Mr. Gonzalez filed a Motion To Withdraw (Docket No. 256 in Case No. 2:06-00019), stating that the Petitioner had "asserted numerous untruths about Counsel's advice as to the defendant testifying at his trial," and that he "clearly is attempting to set a record for a future post conviction relief petition." (Id.) As a result, counsel moved to

withdraw, and the Court granted the motion. (Docket No. 257 in Case No. 2:06-00019).

The Sixth Circuit has explained that "[a] defendant is presumed to have waived his right to testify unless the record contains evidence indicating otherwise." Hodge v. Haeberlin, 579 F.3d 627, 639 (6th Cir. 2009). "A contrary rule would require courts to hold an evidentiary hearing any time a defendant who did not testify at trial filed an after-the-fact statement saying that he wanted to testify but was prevented from doing so." Id. In the absence of an indication from the defendant that he disagrees with the tactical decision not to testify, his assent is presumed. As the court explained in United States v. Webber, 208 F.3d 545, 550-53 (6th Cir. 2000):

> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. . . At base, a defendant must 'alert the trial court' that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. . . . When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.

Id., at 551 (citations omitted).

The Petitioner in this case clearly understood that he had a right to testify. When counsel announced that Petitioner had made the decision not to testify, the Petitioner failed to alert the Court that he disagreed with defense counsel. Consequently, Petitioner is deemed to have waived his right to testify, and his ineffective assistance of counsel claim is without merit. Hodge, 579 F.3d at 640 (Because petitioner is presumed to have assented to decision not to testify, he has not shown that his right to testify was impaired through deficient performance by counsel).

Claim 44 – Through Claim 44, the Petitioner argues that trial counsel provided ineffective assistance by failing to make an opening statement.

During a jury-out hearing before trial began, trial counsel asked the Court if the defense could defer opening argument until after the Government's case-in-chief, and the Court agreed but advised counsel that he would need to state his intentions on the record. (Docket No. 309, at 232-33, in Case No. 2:06-00019). After the Government made its opening statement, trial counsel made the request on the record, and the Court granted it. (Id., at 250). Trial counsel ultimately decided not to make an opening statement prior to the presentation of the defense proof. (Docket No. 315, at 1628, in Case No. 2:06-00019).

Trial counsel's decision to waive an opening statement is generally a matter of trial strategy, and ordinarily will not form the basis for a claim of ineffective assistance of counsel. See, e.g., Moss v. Hofbauer, 286 F.3d 851, 863-64 (6th Cir. 2002). Petitioner has not shown that trial counsel's decision was a deviation from normal trial strategy, or that the failure to make an opening statement resulted in prejudice given the overwhelming evidence of the Petitioner's guilt.

Claim 45 – Petitioner argues that trial counsel was ineffective because he failed to present a defense and failed to put the Government's case to meaningful adversarial testing. Petitioner contends that Mr. Baugh did nothing in the six months he represented the Petitioner, but the only specific prejudice he alleges is that Mr. Baugh failed to prevent the destruction of his computers. As explained above, the Petitioner has failed to demonstrate that the data on the computers was material to his defense. Accordingly, Petitioner has failed to establish prejudice resulting from any failure of Mr. Baugh with regard to Petitioner's computers.

The specific deficiencies Petitioner ascribes to Mr. Gonzalez are his failure to present an entrapment defense, and failure to argue that the Petitioner could not conspire with Ms. Langford

54

because she was a government agent. Petitioner has failed to specify the offenses for which he believes counsel should have raised an entrapment defense, nor has he explained how the facts adduced at trial would have supported such a defense. As for his allegation that Ms. Langford was acting as a government agent, the Court has rejected that allegation for the reasons explained above. Accordingly, Petitioner has not shown he was prejudiced by these alleged failures of counsel.

To the extent Petitioner complains that Mr. Koger failed to raise double jeopardy arguments at sentencing, the Court has rejected all Petitioner's double jeopardy claims except the one involving Counts 13 and 14, and on those counts, the Court has provided a remedy. Therefore, Petitioner has not been prejudiced by any failure on the part of Mr. Koger. In any event, as explained above, Mr. Koger was not deficient for failing to anticipate the double jeopardy holding in <u>Mann</u>.

<u>Claim 46</u> – Petitioner argues that he received the ineffective assistance of counsel because trial counsel failed to give a proper summation including a theory of defense. The record reveals that counsel gave a closing argument that spans some 50 transcript pages. (Docket No. 315, at 1712-1754, in Case No. 2:06-00019).  At the outset of his closing argument, counsel suggested that the Government's case was a "tangled web" of deceit, failed memories, and self-interested statements, and throughout the summation, counsel went through the testimony and evidence offered by the Government, and explained in detail the reasons the jury should reject it. (<u>Id.</u>)

The right to effective assistance of counsel extends to closing arguments, but counsel has "wide latitude in deciding how best to represent a client, and deference to counsel's tactical

decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 124 S.Ct. 1, 5-6, 157 L. Ed.2d 1 (2003). See also Cope v. United States, 272 Fed. Appx. 445, 448-49 (6th Cir. March 27, 2008).

Trial counsel's closing was thorough, organized, and effectively highlighted the weaknesses in the Government's case, especially given the overwhelming nature of the evidence of Petitioner's guilt. Petitioner has failed to establish that trial counsel's summation was deficient, or that he suffered prejudice as a result of any deficiency.

Claim 47 – Petitioner argues that he received ineffective assistance because trial counsel failed to properly impeach Government witnesses.

Petitioner contends that counsel should have asked Ms. Langford about her statement to the police before trial that the Petitioner would not talk about the murder-for-hire plot on the telephone (Docket No. 134-1, at 32) because that statement contradicts her trial testimony that the Petitioner spoke with her about the plot over the phone (Docket No. 311, at 838-41; and Docket No. 312, at 1082-83; in Case No. 2:06-00019). The record reveals, however, that counsel did ask Ms. Langford about that statement, and she explained that she meant the Petitioner would not talk on the telephone with the undercover officer about the murder-for-hire plot. (Docket No. 313, at 1204, in Case No. 2:06-00019). Thus, trial counsel was not deficient in that regard.

Petitioner also contends that counsel should have impeached Ms. Langford's testimony with the undercover audio recordings because they reveal that Ms. Langford, not the Petitioner, was the person involved in drug trafficking. Ms. Langford was charged with, and testified about,

56

her drug trafficking activities, and those activities were recorded on the audio recordings. The recordings do not reveal, however, that the Petitioner "was nowhere to be found" as he alleges (Docket No. 129, at 237), and counsel was not deficient for failing to impeach Ms. Langford in that regard.

Petitioner argues that trial counsel should have challenged the testimony of Michelle Polites that she worked for the Petitioner at his restaurant and observed him pay employees with controlled substances. According to the Petitioner, Ms. Polites never worked for him, and counsel should have obtained business and tax records to refute this testimony.

The record reveals that Ms. Polites did testify that she worked for the Petitioner in October or November 2005, and observed him pay his employees with cocaine. (Docket No. 314, at 1468, in Case No. 2:06-00019). The main thrust of her testimony related to the Petitioner's drug trafficking activities, and her discovery of letters in which the Petitioner appears to be plotting to kill her. (Id., at 1463-1475). As for his claim that Ms. Polites was not an employee, the Petitioner has not produced the records he contends counsel should have obtained, nor has he demonstrated that he was prejudiced by any failure of counsel to impeach Ms. Polites on such a minor point, which assumes the Petitioner kept accurate business and tax records.

Petitioner argues that counsel should have cross examined Robyn Welch about a statement she made in a Report Of Investigation to agents of the ATF that "she never saw DUNN with a firearm." (Docket No. 134-1, at 19). The Petitioner contends that this would have impeached Ms. Welch's trial testimony that she saw the Petitioner fire the Norinco. (Docket No. 313, at 195-197, in Case No. 2:06-00019). The parties have provided no other information about the Report of Investigation, which the Petitioner filed as part of the record in this case.

Assuming the document is authentic, that trial counsel had access to the document prior to his cross examination of Ms. Welch, and that he was deficient in failing to impeach her with the prior statement, the Court is not persuaded that the Petitioner was prejudiced as a result. Trial counsel cross examined Ms. Welch thoroughly about her hope for leniency in exchange for her testimony, and her prior statements indicating that the Petitioner was not serious about the plot to kidnap and kill that he described in his letters to her. (Docket No. 313, at 1422-1432, in Case No. 2:06-00019). In light of the other witnesses who testified to seeing the Petitioner fire the Norinco (Docket No. 311, at 766-775 (Ms. Langford); Docket No. 314, at 1532-1541 (Mr. Hall); in Case No. 2:06-00019), and the overwhelming evidence of the Petitioner's guilt on the machine gun counts, the Court concludes that the Petitioner has failed to sustain this ineffective assistance of counsel claim.

Petitioner also argues that trial counsel should have impeached the testimony of Ms. Welch and Mr. Hall that the Petitioner fired the Norinco with evidence that the firearm had a broken magazine and a missing piece that kept it from firing automatically. To support his argument, Petitioner has filed an Official Firearms Report, apparently issued by Donald I. Carman of the Tennessee Bureau of Investigation, which lists the "Subject" as "William V. Dunn," and Exhibit 10-a as a "Rifle, 7.62 x 39 mm, Norinco, SKS, SN: 24008410K and magazine from subject's property." (Docket No. 134-1, at 8-9). Under "Results," the Report states as follows:

> Exhibit 10a rifle was received with a non-functional magazine. Upon test firing Exhibit 10a using a reference firearm magazine it was determined that Exhibit 10a would discharge a cartridge but not cycle the action. The bolt was not recoiling to extract and eject the fired cartridge case, cock the hammer, load the next cartridge and lock into battery. Further examination of Exhibit 10a revealed it to have a missing gas piston. By installing a reference firearm gas piston and

using the reference magazine it was determined that Exhibit 10a would fire in the
full automatic mode of fire. Disassembly and examination of the trigger assembly
of Exhibit 10a revealed that the sear and trigger bar had been altered.

(Id.)

At the trial, the Government called Max Kingery of the Firearms Technology Branch of

the Bureau of Alcohol, Tobacco and Firearms as an expert to testify about the Norinco. (Docket

No. 311, at 707-740, in Case No. 2:06-00019). Mr. Kingery testified that the Norinco had been

modified to fire automatically by altering the seer and trigger housing group, and that the gas

piston, which allows the firearm to fire automatically, was missing from the firearm. (Id., at 714-

723). Agent Kingery testified that he used a gas piston from another Norinco, and the firearm

immediately began to fire automatically. (Id., at 722-23). Agent Kingery also testified that the

magazine that came with the firearm was bent, and that he used another magazine to test fire the

weapon. (Id., at 737-38). Agent Kingery testified that the firearm satisfied the definition of

"machine gun." (Id., at 711, 723-25).

Petitioner argues that counsel should have used the TBI report to impeach the testimony

of Ms. Welch and Mr. Hall that they saw the Petitioner fire the Norinco multiple times with a

single pull of the trigger. The Petitioner contends that because the TBI report said the Norinco

had a broken magazine and a missing piece, the witnesses could not have seen him fire the

Norinco automatically. The obvious flaw in the Petitioner's reasoning is in assuming that the

Norinco that was examined by the TBI was in the same state as when the witnesses observed the

Petitioner fire it. As Agent Kingery testified, when he added a gas piston from another Norinco

and used a magazine that was not "bent," the Petitioner's Norinco fired automatically. Therefore,

as the suggested impeachment would not have been effective, any failure to cross examine Ms.

Welch and Mr. Hall with the TBI's report was not deficient, and did not result in prejudice to the Petitioner.

Finally, the Petitioner argues that trial counsel failed to properly cross examine Government witness Brenda Wilson. Ms. Wilson testified on rebuttal that she occasionally worked as a caregiver for the Petitioner's grandmother, and in that capacity, she heard the Petitioner talking on the telephone about getting rid of a witness. (Docket No. 315, at 1671-1679, in Case No. 2:06-00019). Ms. Wilson further testified that she worked three jobs, and helped build her Habitat for Humanity home. (Id.)

The Petitioner contends that Ms. Wilson is an "alcoholic drug addict" and "absentee parent" whose main source of income was drug distribution, and that trial counsel would have known that had he accessed Ms. Wilson's rental and utility records, phone records, tax records, employment records, and other financial records. The Petitioner has not, however, filed any such records, nor has he offered any other factual support for his allegations about Ms. Wilson. Accordingly, Petitioner has failed to establish that trial counsel was ineffective regarding his cross examination of Ms. Wilson.

Claim 48 – Petitioner argues that he received ineffective assistance of counsel because counsel failed to request a jury instruction regarding the destruction of the Petitioner's computers. Petitioner contends that such an instruction would have informed the jury that they could infer the destroyed evidence was exculpatory.

In order to show he was entitled to such an instruction, Petitioner would had to have shown: (1) that the party having control over the evidence had a obligation to preserve it at the time it was destroyed; (2) that the evidence was destroyed in bad faith or "with a culpable state

of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. See United States v. Greco, 734 F.3d 441, 447 (6th Cir. 2013); United States v. Boxley, 373 F.3d 759, 762-63 (6th Cir. 2004).

As the Court explained at the conclusion of the pretrial hearing on Petitioner's motion to dismiss for spoliation of evidence, Petitioner failed to establish that the data on his computers was destroyed in bad faith. (Docket No. 359, at 181-83, in Case No. 2:06-00019). Consequently, any failure by counsel to request an adverse inference instruction did not result in prejudice to the Petitioner because the request would have been denied.

Claim 49 – Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to have the undercover audio footage forensically analyzed to provide better clarity. Petitioner contends that the testimony of the undercover officers at trial regarding the inaudible portions of the recordings was false, and that the jury never heard the actual statements made on the recordings, which would have exonerated him. According to the Petitioner, one of his attorneys hired someone to improve the audibility of the recordings shortly before trial, but at that point, there was an insufficient amount of time to do the job properly.

In Petitioner's direct appeal, the Sixth Circuit considered Petitioner's complaints about the recordings and transcripts:

> In his final claim, Dunn asserts that the trial court erred in admitting transcripts of recordings made by undercover officers. He asserts that the recordings are unintelligible and that the transcripts, prepared by the government and purporting to represent the contents of the recordings, were questionable. Dunn's claim fails, however, because the government witnesses involved in the recording testified that the transcripts of the recordings were true and accurate, see United States v. Martin, 920 F.2d 393, 397-98 (6th Cir.1990), and the district court instructed the jury that the tapes and not the transcripts were evidence. See United States v.

> Scarborough, 43 F.3d 1021, 1024-25 (6th Cir.1994) (citing United States v.
> Puerta Restrepo, 814 F.2d 1236, 1242 (7th Cir.1987)). Moreover, Dunn did not
> object to the introduction of the transcripts at trial or the district court's instruction
> to the jury. The district court did not plainly err by admitting the transcripts. See
> Fed.R.Crim.P. 52(b) (permitting a court to review the admission of evidence
> under the plain error standard if it affects substantial rights, even though a party
> fails to object to it).

United States v. Dunn, supra, at *3.

In order to establish prejudice, the Petitioner must support his allegations that the Government witnesses lied about what was said on the recordings. As discussed throughout this opinion, the Petitioner has failed to do so.

Claim 50 – Petitioner argues that he received ineffective assistance because trial counsel allowed the Government to use erroneous transcripts at trial that misrepresented the undercover audio. As discussed above, however, the Petitioner has not shown that the testimony regarding the inaudible portions of the recordings was false, and therefore, he has failed to establish prejudice as a result of any failure by counsel to challenge the use of the transcripts.

Claim 51 – Petitioner argues that he received ineffective assistance of counsel because neither Mr. Baugh nor Mr. Gonzalez appropriately requested discovery under the Federal Rules of Criminal Procedure, Brady v. Maryland, Giglio v. United States, or the Jencks Act. As a result, Petitioner argues, he lost the information stored on his computers; and was not provided with inventories of items seized from his residence and documents from the Tennessee Department of Revenue, in time for their effective use in establishing the alleged perjury of Detective Roland.  As discussed with regard to Claim 10 above, Petitioner has not shown that the information allegedly withheld from him would have been material to his defense. Accordingly, the Petitioner has not shown that any failure by counsel to obtain the information timely resulted

in prejudice to him.

Claim 52 – Petitioner argues that trial counsel was ineffective for failing to obtain a forensic analysis of the data devices found in his computer bag. Petitioner claims that those data devices contain the evidence that was on his computers, and that he told counsel to check the devices when Detective Roland testified about them during the trial. According to the Petitioner, counsel reported back to him that the data devices contained no information.

Petitioner has failed to establish prejudice as a result of any failure by counsel to arrange a forensic analysis of the data devices to which the Petitioner refers. Petitioner alleges the data devices may have contained a copy of the data that was on his computers, and as discussed above, the Petitioner has not shown his computers contained material evidence.

Claim 53 – Petitioner argues that he received ineffective assistance because trial counsel failed to assert his speedy trial rights or to timely object to the Fifth Superseding Indictment on speedy trial grounds.

The Speedy Trial Act, 18 U.S.C. § 3161, et seq., provides that in "any case in which a plea of not guilty is entered, the trial ... shall commence within seventy days" from the later of (1) the "filing date" of the information or indictment or (2) a defendant's first appearance before a judicial officer. 18 U.S.C. § 3161(c)(1). See United States v. Smith, 510 Fed. App'x 390, 393, 2013 WL 58444 (6th Cir. Jan. 7, 2013). The 70-day period set forth in the Act is subject to a number of exclusions, including continuances that serve the ends of justice:

> (7)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this

63

paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

(B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

(C) No continuance under subparagraph (A) of this paragraph shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.

18 U.S.C. § 3161(h)(7).

Petitioner's initial appearance in the underlying criminal case was on October 31, 2006

(Docket No. 7 in Case No. 2:06-00019). The first Indictment was filed on November 29, 2006, and trial was set for January 30, 2007 (Docket Nos. 22, 27 in Case No. 2:06-00019). At a status conference on January 19, 2007, both the Petitioner and Co-Defendant Langford requested a continuance and orally waived their speedy trial rights. (Docket Nos. 32, 33 in Case No. 2:06-00019). The Court granted the request, finding it to be in the interest of justice under the Speedy Trial Act, and continued the trial to June 5, 2007. (Id.) After Mr. Gonzalez took over representation of the Petitioner, he filed a motion to continue the trial, along with a Waiver Of Right To A Speedy Trial signed by the Petitioner. (Docket Nos. 61, 62 in Case No. 2:06-00019). The Court granted the motion and continued the trial to October 2, 2007, finding that the continuance was in the interest of justice as counsel needed additional time to prepare for trial. (Docket No. 64 in Case No. 2:06-00019).

The Grand Jury issued a Superseding Indictment on September 6, 2007, adding firearms and additional drug trafficking charges against the Petitioner. (Docket No. 80 in Case No. 2:06-00019). Mr. Gonzalez then filed another motion to continue based on the new charges and other grounds, along with another Waiver Of Right To A Speedy Trial signed by the Petitioner. (Docket Nos. 84, 85 in Case No. 2:06-00019). The Court granted the motion and continued the trial to January 8, 2008, finding that the continuance was in the interest of justice as counsel needed additional time to prepare for trial. (Docket No. 86 in Case No. 2:06-00019).

Mr. Gonzalez filed another motion to continue on December 31, 2007 based on several grounds, including counsel's understanding that additional firearms charges would be filed against the Petitioner, and the recent disclosure that the Government intended to introduce letters written by the Petitioner that counsel had not seen. (Docket No. 120 in Case No. 2:06-00019).

Counsel also filed another Waiver Of Right To A Speedy Trial signed by the Petitioner. (Docket No. 121 in Case No. 2:06-00019). After holding a hearing on January 2, 2008, the Court granted the motion and continued the trial to June 10, 2008, again finding that it was in the interest of justice to do so. (Docket Nos. 122, 123, 355 in Case No. 2:06-00019). The Grand Jury issued the Second Superseding Indictment later that same day, adding another firearms charge. (Docket No. 125 in Case No. 2:06-00019). On April 23, 2008, the Grand Jury issued the Third Superseding Indictment, adding charges arising out of Petitioner's soliciting the murder of various individuals while in pretrial incarceration. (Docket No. 135 in Case No. 2:06-00019). On May 21, 2008, the Grand Jury issued the Fourth Superseding Indictment, adding an obstruction of justice charge for soliciting perjured testimony. (Docket No. 158 in Case No. 2:06-00019).

After the Court subsequently held a Pretrial Conference, the Petitioner filed a notice, on June 3, 2008, indicating that he would proceed to trial on June 10, 2008, despite the recent issuance of the Fourth Superseding Indictment. (Docket Nos. 160, 161, 164 in Case No. 2:06-00019). Later on June 3, 2008, the Grand Jury issued a Fifth Superseding Indictment, adding certain drug trafficking and firearms charges, and dropping other charges. (Docket No. 166 in Case No. 2:06-00019).

The Court held a status conference on June 6, 2008, and later that same day, counsel filed a notice indicating that he did not consent to proceed to trial on June 10, 2008, in light of the issuance of the Fifth Superseding Indictment. (Docket Nos. 171, 172, 357 in Case No. 2:06-00019). The Court then held another status conference, on that same day, to discuss a new trial date, during which trial counsel indicated that the Petitioner wanted to set the new trial date within 70 days. (Docket Nos. 173, 174, 358 in Case No. 2:06-00019). The Court continued the

trial to October 21, 2008, finding it to be in the interest of justice to do so, given the issuance of the Fifth Superseding Indictment, and the multiple criminal trials on the Court's calendar expected to be tried during the 70-day period preventing the scheduling of an earlier trial date. (Id.)

On September 8, 2008, the Government filed a motion to continue the trial based on the need for the Petitioner to be examined by a government psychiatrist in light of the Petitioner's having filed a notice of intent to rely on expert testimony regarding his mental state. (Docket No. 194 in Case No. 2:06-00019). After holding a hearing, the Court denied the motion to continue. (Docket Nos. 200, 201 in Case No. 2:06-00019). Trial began on October 21, 2008. (Docket No. 232 in Case No. 2:06-00019).

All the continuances granted by the Court were based on a finding that the ends-of-justice were served by the delay, and all but the last continuance were also based on the Petitioner's signed waiver of his speedy trial rights. Petitioner has not shown that the Court's ends-of-justice findings were in error, nor has he otherwise established a violation of the Speedy Trial Act regarding the continuances. Accordingly, his contention that counsel should have raised a challenge based on the Speedy Trial Act is without merit.

Petitioner appears to also argue that counsel should have challenged the delay as a violation of his constitutional right to a speedy trial. The Sixth Amendment guarantees an accused in a criminal prosecution "the right to a speedy and public trial." U.S. Const. Amend. VI. In Barker v. Wingo, 407 U.S. 514, 523-30, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court established a four-factor test for determining whether a constitutional speedy trial violation has occurred. The factors to be considered are: (1) whether the delay was uncommonly

long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice resulted to the defendant. 407 U.S. at 530.  If a court concludes that a speedy trial violation has occurred, the remedy is dismissal of the charges with prejudice. United States v. Jackson, 473 F.3d 660, 664 (6th Cir.2007); United States v. Williams, 231 Fed. Appx. 457 (6th Cir. Aug. 10, 2007).

In considering the first Barker factor, the period to be considered is that between the date of indictment or arrest, whichever is earlier, and the trial date. United States v. Young, 657 F.3d 408, 414 (6th Cir. 2011).  The Petitioner was arrested on the federal charges on October 31, 2006, and his trial began on October 21, 2008.  A delay of over one year is "presumptively prejudicial" and triggers application of the remaining three Barker factors. Id.; United States v. Watford, 468 F.3d 891, 901-02 (6th Cir. 2006).

As to the second factor, the Barker Court explained that when considering the reason for the delay, the purpose is to determine whether the government or the defendant is more to blame. Barker, 407 U.S. at 531; Watford, 468 F.3d at 902.  In Petitioner's case, every continuance granted by the Court was at the request of defense counsel, and as explained above, was in the interest of justice in order to obtain a fair trial *for the Petitioner*. The Petitioner appears to blame the Government for delays attendant to the adding of charges after the initial Indictment. Several charges could not have appeared in the initial Indictment, however, because they were based on the conduct of Petitioner that occurred after issuance of that Indictment, while the Petitioner was in pretrial detention. This factor, therefore, would not have weighed in favor of the Petitioner had trial counsel raised such a challenge.

The third Barker factor is whether the defendant has asserted his right to a speedy trial.

The Petitioner raised no challenge to the continuances in this case, and in fact explicitly waived his speedy trial rights each time, until June 6, 2008. Petitioner was tried approximately four months after that first assertion of speedy trial rights. Thus, the third <u>Barker</u> factor would not have weighed heavily in favor of the Petitioner had trial counsel raised such a challenge.

The final <u>Barker</u> factor is whether the Petitioner suffered prejudice from the pre-trial delay. The Supreme Court has explained that in considering this factor, three interests are paramount: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. <u>Barker</u>, 407 U.S. at 532; <u>Watford</u>, 468 F.3d at 907. Of these three interests, "'the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" <u>Young</u>, 657 F.3d at 418 (quoting <u>Barker</u>, 407 U.S. at 532).

The Petitioner argues that he was prejudiced as follows: (1) the delay resulted in the loss of the exculpatory evidence stored in his computers; (2) the delay allowed the Government to strengthen their case; (3) the delay resulted in loss of memory by Government witnesses, Deputy Cessna, Agent Kilday, Detective Roland, Ms. Langford, and Mr. Harville; and (4) the delay resulted in Petitioner's incarceration at a county jail two hours away from the courthouse for two years.

As the Court has determined that the Petitioner did not assert his speedy trial rights until four months before trial, any prejudice that resulted from prior delays would not weigh in his favor. In any event, the Petitioner has not shown any specific prejudice resulting from the pretrial delays. As discussed above, the Petitioner has not established that there was exculpatory evidence stored in his computers. As for the ability of the Government to strengthen its case, and

the fading memories of the witnesses, the Petitioner has not provided any specific basis to conclude that the Government's case would have been weaker, and that the answers of the Government witnesses would have been different had the case been tried at an earlier time. Finally, the Petitioner has not shown that his pretrial incarceration was oppressive, or that it had a specific detrimental impact on his defense. Under these circumstances, his generalized claims of prejudice are not substantial enough for this factor to weigh in his favor. See Young, 657 F.3d at 418-19. Therefore, had counsel raised a speedy trial challenge, the fourth Barker factor would not have weighed in his favor.

Application of the four-factor Barker test would not have supported a Sixth Amendment speedy trial violation. Accordingly, trial counsel was not deficient in failing to raise such a challenge.

Claim 54 – Petitioner argues that he received ineffective assistance because none of his attorneys knew the relevant and proper law and procedure in their representation of him. To support this argument, the Petitioner relies on the validity of the Sixth Amendment claims discussed above, which the Court has found to be without merit.

The only other specific allegations the Petitioner makes are that Mr. Baugh made a hearsay objection at the preliminary/detention hearing that was overruled; and Mr. Gonzalez stated, in a jury-out hearing, that he did not understand the procedure required by the Kentucky prison system for securing a prisoner, Alanda Lewis, to testify at trial. As to Mr. Baugh, the record indicates that in making the objection, Mr. Baugh was making the point that the testimony offered by the Government should be accorded less weight given its hearsay nature. (Docket No. 131, at 20, in Case No. 2:06-00019). Mr. Baugh's statement was appropriate argument, and does

not support a finding that his representation at the hearing was ineffective. Mr. Gonzalez's statement was simply a reflection on the procedural complexity of the Kentucky state prison system rules for securing the presence of its prisoners for court proceedings in other states, and does not indicate that his representation was deficient. (Docket No. 313, at 1231, in Case No. 2:06-00019). As discussed above, any failure to obtain the testimony of Alanda Lewis for trial did not result in prejudice to the Petitioner.

Claim 55 – Finally, Petitioner argues that the accumulated effect of counsel's ineffectiveness prevented him from receiving a fair trial. As the Court has not found merit in any of Petitioner's ineffective assistance of counsel claims, he has failed to establish that the "accumulated effect" of the alleged errors deprived him of a fair trial. This claim is without merit.

## IV. Conclusion

For the reasons set forth herein, the Court concludes that the Government's Motion To Dismiss should be denied, and the Petitioner's Motion To Vacate should be granted in part and denied in part.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order, such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right, with the exception of a portion of Claim 12 as described herein. Castro

v. United States, 310 F.3d 900 (6th Cir. 2002).

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE